565 A.2d 114·

**JOHN J. KIRLIN, INC.**

v.

**GACO SYSTEMS, INC.**

**No. 86, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Nov. 1, 1989.

Certiorari Denied Jan. 10, 1990.

Timothy J. Bloomfield (Andrew W. Stephenson, Marc S. Zweben and Dunnells, Duvall, Bennett & Porter, on the brief), Washington, D.C., for appellant.

Shirlie Norris Lake (Kenneth H. Meltzer and Eccleston and Wolf, on the brief), Baltimore, for appellee.

Argued before WILNER, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

This controversy arose from a contract for the design, manufacture and installation of a water purification system at a Howard County facility being constructed for the Bendix Corporation (Bendix). Appellant John J. Kirlin, (Kirlin), the mechanical and plumbing subcontractor for that construction project, entered into a contract with Gaco Systems, Inc. (Gaco), the appellee, by which Gaco agreed to design, fabricate, install and render operational a Deionizing Reverse Osmosis (DIRO) System. Disputes arose during the early stages of performance under the contract. Eventually, Gaco filed a Petition in the Circuit Court for Howard County to Establish a Mechanic's Lien against Bendix. Kirlin intervened in the action and filed a counterclaim against Gaco for breach of contract. Gaco filed an amended Petition to Establish a Mechanic's Lien and Complaint in which it asserted a breach of contract claim directly against Kirlin. After Kirlin posted a surety bond to secure payment of any successful claims of Gaco, the court removed the lien against Bendix's property, and the case

proceeded on Gaco's breach of contract claim and Kirlin's counterclaim.

At a bench trial, the court concluded that Kirlin had breached the contract by failing to make timely payments to Gaco for services rendered and materials supplied. Judgment in the amount of $138,657.75 was entered in favor of Gaco.

On appeal from that judgment, Kirlin raises the following issues:

    I.   Did the trial court err in concluding that Kirlin was in breach of the contract and therefore that Gaco's stoppage of performance was not a repudiation?

    II.   Did the trial court properly exclude evidence from meetings held by the parties in March of 1986?

In addition, Gaco raises the following issue on cross-appeal:

    III.   Did the trial court abuse its discretion by not awarding prejudgment interest on damages?

Because we hold that the court improperly excluded relevant evidence as to what transpired at meetings attended by representatives of the parties on March 26 and 27, 1986, we shall vacate the judgment entered against Kirlin and remand the case for further proceedings.

## FACTS

On April 17, 1985, Gaco agreed for a price of $645,000 to design, manufacture and install an operational DIRO System at Bendix. Payments on account of the contract price were to be made by Kirlin as follows:

—10% of the contract price ($64,500) upon submission of major drawings

—50% of the contract price ($322,500) upon the procurement of vessels and internals

—35% of the contract price ($225,750) upon shipment of equipment

—5% of the contract price ($32,250) upon acceptance of the system, not to exceed 90 days from the date of shipment

The first of the major design drawings submitted by Gaco were rejected by Bendix's project engineer on May 14, 1985. These were revised and resubmitted by Gaco on June 17, 1985. Other major design drawings were not submitted until September, 1985; nevertheless, Gaco submitted an invoice for the first progress payment due under the contract on June 17, 1985. Gaco procured the vessels and internals for the DIRO System and billed Kirlin for $322,500 on July 30, 1985.

By the latter part of September 1985, major portions of the DIRO System were ready for shipment to the construction site; however, Kirlin had not made payment on either of the outstanding invoices submitted by Gaco despite repeated demands made by Gaco's representatives that these delinquencies be remedied. At that point, Gaco insisted that the overdue invoices be satisfied before it would ship any components of the DIRO System. Notwithstanding this threat, Gaco shipped major sections of the DIRO system to Kirlin on or about September 20, 1985, after receiving assurances from Kirlin's project manager that the overdue account would be promptly satisfied.

On September 25, 1985, Kirlin sent Gaco an unsigned check for $322,500, the amount of the second invoice. Gaco officials testified that, although the check was unsigned, Kirlin's representatives advised them to deposit the check and that it would be honored by the drawee, Riggs National Bank (Riggs). Gaco negotiated the check on September 27, 1985. The same day Kirlin sent Gaco a second check, this one signed, for the same amount. Gaco negotiated that check on October 3, 1985.

Without advising Kirlin that it had been paid twice on its invoice of $322,500, Gaco continued to press for the payment of its other outstanding invoices ($64,500 for the major drawings and $225,750 following the shipment of the

DIRO equipment.) On October 17, 1985, Kirlin issued two more checks, one for $118,680 and the other for $171,500, totalling the $290,250 due on Gaco's outstanding invoices. Gaco deposited both of these checks and then advised Kirlin that it had negotiated both of its $322,500 checks.

When Riggs learned of its error in honoring Kirlin's unsigned check for $322,500, it credited Kirlin's account for that amount on October 28, 1985. Meanwhile, Kirlin learned from its bank that Gaco had failed to endorse its $118,680 check which Gaco had deposited for collection. Kirlin instructed its bank not to honor the check pending further discussion with Gaco.

Representatives of Kirlin and Gaco met on October 30, 1985, to discuss a refund by Gaco of the overpayment it had received. Kirlin demanded that Gaco refund $296,700 which would have left Gaco fully satisfied on the amounts it had invoiced under the original contract plus paying $12,000 on a disputed change order where Gaco claimed $40,800 for polishing storage tanks. Gaco would only agree to refund $235,000. After Gaco delivered its check to Kirlin in the amount of $235,000, Kirlin stopped payment on its earlier $118,680 check issued to Gaco which had been presented to its bank for collection but which had not been honored pursuant to Kirlin's instruction. When Gaco learned of this stop payment order, it stopped payment on its $235,000 check.

By letter of December 12, 1985, Kirlin notified Gaco that Riggs had recognized its error in honoring the unsigned check for $322,500 and that Kirlin's account at Riggs had been re-credited with that amount. Kirlin advised Gaco that it should therefore reimburse Riggs. Gaco refused to do so, and Riggs sued Gaco in Niagara County, New York to recover the $322,500 which Gaco had received as the result of Riggs's error. The New York Court entered summary judgment against Gaco on March 6, 1986, in the amount of $322,500 together with interest thereon of $6,679.73 and costs. That judgment was satisfied by Gaco.

On March 20, 1986, Gaco advised Kirlin that it was discontinuing work on the Bendix project and that it would not return unless Kirlin immediately paid $205,530. This sum represented the difference between $699,600 (the original contract price of $645,000, an approved change order of $13,800 and the $40,800 change order for polishing tanks which Kirlin had disputed) and $494,070 (the $816,570 that Kirlin had already paid, less $322,500). The following day Kirlin advised Gaco that it disputed the amount claimed by Gaco and notified Gaco that if its employees did not resume work on the Bendix project by March 24, 1986, Kirlin would make other arrangements for completion of the work required to start up the DIRO System.

At this point representatives of Gilbane Building Company, Inc. (Gilbane), the prime contractor on the Bendix project, offered to mediate the dispute between Kirlin and Gaco. Gaco agreed to host such mediation sessions at its Brantford, Ontario office. Gaco's employees resumed the start up operations at the project on March 25, 1986. The mediation took place on March 26 and 27, 1986, but was unsuccessful. Gaco discontinued work on the project and Kirlin made other arrangements for the completion of its subcontract to deliver an operational DIRO System.

## THE EXCLUDED EVIDENCE

Section 2-609(1) of Comm.Law Code Ann. which governed Gaco's contract with Kirlin provides in pertinent part:

> When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

Patently, Gaco, by its letter of March 20, 1986, exercised this right to demand "adequate assurance" from Kirlin that Gaco would be paid for completion of its performance of the contract. In that letter Gaco notified Kirlin that it was

suspending its work on the project until Kirlin paid $205,-530. The obvious purpose of the meetings which were held between representatives of Gaco and Kirlin on March 26 and 27, 1986 was an attempt by the parties with the help of Gilbane to see whether Kirlin would give "adequate assurance of due performance" of its obligations under the contract.

Kirlin proffered the following evidence relating to the assurances that were given Gaco at the meetings on March 26 and 27, 1986:

1. Although Gaco had agreed in a March 24, 1986 letter to consider payment to "an informed third party" of the $32,500 due Gaco under the contract upon completion of the installation and start up of the DIRO System and Bendix's acceptance of the system, and despite Kirlin's offer to escrow that amount, Gaco reverted at the meetings to its demand for advance payment for the full contract price.

2. Kirlin offered to pay Gaco a new increase to the contract price of $14,000 to resolve Gaco's claim of $40,800 for the disputed tank polishing change order.

3. In response to that offer of an additional $14,000, Gaco responded with a new and additional demand for $8,000 based upon Gaco's duty to pay interest to Riggs on the $322,500 which it had improperly retained when Riggs erroneously honored Kirlin's unsigned check.

In addition to demonstrating assurances which Kirlin gave of future performance of the contract, this evidence was equally relevant to the issue of whether Gaco's demands at those meetings constituted a repudiation of the contract under § 2–610 of the Comm.Law Code Ann.[1] As stated in

---

**1.** Section 2–610 provides:

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(a) For a commercially reasonable time await performance by the repudiating party; or

official comment 2 on § 2–610 by the Commissioners on Uniform State Laws:

> Under the language of this section, a demand by one or both parties for more than the contract calls for in the way of counter-performance is not in itself a repudiation nor does it invalidate a plain expression of desire for future performance. However, when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation.

This principle was applied in *Design for Business Interiors, Inc. v. Herson's,* 659 F.Supp. 1103 (D.D.C.1986), where the seller informed the buyer that its account was delinquent in excess of $23,000 and that all future deliveries would be withheld until the account was brought up-to-date. In addition, seller also notified the buyer that it was requiring that all deliveries be paid for in advance—an alteration of the express language of the contract which called for payment to be made by the buyer within 10 days after delivery. The court observed that

> [t]his is not a request for assurance, but is instead a unilateral alteration of the contract's terms, as well as an express refusal to render performance due under the terms of the original agreement—that invoices and payment were to follow, not precede, delivery.

*Id.* at 1111.

The Court thus held that this demand for enhanced performance of the contract by the buyer constituted a repudiation of the contract by the seller. *See also National Farmers Org. v. Bartlett & Co. Grain,* 560 F.2d 1350 (8th Cir.1977) (Where seller informed buyer that delivery under

---

(b) Resort to any remedy for breach (§ 2–703 or § 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c) In either case suspend his own performance or proceed in accordance with the provisions of this title on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods.

a contract would be withheld until payment was made on a separate contract, this constituted a repudiation by seller); *Pittsburgh–Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572 (7th Cir.1976) (Where seller refused to perform unless buyer gave a personal guarantee of payment or agreed to escrow payment not yet due, this constituted repudiation by seller). As the above cases demonstrate, what transpired at the Ontario meetings of the representatives of the parties could be critical to a resolution of this case. Notwithstanding the relevance of the evidence concerning the discussions which took place at the meetings on March 26 and 27 attended by representatives of Gaco, Kirlin and Gilbane, the trial court refused to receive it on the ground that such discussions involved offers of compromise.

■ Evidence of offers made by a party to litigation of compromise is inadmissible as a matter of the public policy which encourages settlements of disputed claims. *Mateer v. Reliance Ins. Co.*, 247 Md. 643, 646, 233 A.2d 797 (1967); *Eisenberg v. Air Conditioning, Inc.*, 225 Md. 324, 338, 170 A.2d 743 (1961); McLain, *Maryland Evidence*, § 408.1. In applying this exclusionary rule, however, a court must determine whether the proffered statements of the litigant (or his, her or its agent) are offered for purposes other than to prove the validity or invalidity of the claims at issue in the case. *Mateer v. Reliance Ins. Co., supra*, 247 Md. at 648, 233 A.2d 797; *Federal Mut. Ins. Co. v. Lewis*, 231 Md. 587, 191 A.2d 437 (1963); *Aetna Life Ins. Co. v. Bittinger*, 159 Md. 262, 265, 150 A. 713 (1930). In the instant case the statements made by the representatives of the parties were offered for a purpose other than to prove the validity or invalidity of their respective claim's merit, and consequently, they were not within the ambit of this exclusionary rule, and the court abused its discretion in invoking it.

The exclusion of this evidence requires that we vacate the judgment and remand the case for limited further proceedings. On remand, the court should receive the evidence that Kirlin proffered as to what occurred at the meetings on

March 26 and 27, 1986, as well as any evidence in rebuttal which Gaco may wish to offer. *Cf. Abraham v. Moler*, 253 Md. 215, 218–19, 252 A.2d 68 (1969). Depending upon the court's fact finding as to what occurred at those meetings, the court will then render its judgment.

JUDGMENT VACATED;

CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION;

COSTS TO BE PAID BY THE APPELLEE.