**FAYETTEVILLE INVESTORS,**
Plaintiff–Appellant,

v.

**COMMERCIAL BUILDERS, INCORPORATED; American Casualty Company of Reading, Pennsylvania, Inc., Defendants–Appellees.**

No. 90–2449.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1991.

Decided June 28, 1991.

As Amended July 11, 1991.

Marland Cornelius Reid, Reid, Lewis, Deese & Nance, Fayetteville, N.C., for plaintiff-appellant.

Margaret Cain Lumsden, Hunton & Williams, Raleigh, N.C., argued (Julius A. Rousseau, III, Hunton & Williams, Raleigh, N.C., Deborah L. Fletcher, Laura H. Hamilton, Hunton & Williams, Richmond, Va., on brief), for defendants-appellees.

Before WIDENER, Circuit Judge, CHAPMAN, Senior Circuit Judge, and HOFFMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

WALTER E. HOFFMAN, Senior District Judge:

This action calls for consideration of the interplay of Rules 12(b)(6), 54, 56, 59 and 60 of the Federal Rules of Civil Procedure, and particularly the differing standards applied to motions under Rules 12(b)(6), 59 and 60. Appellant seeks review of the denial of a motion for reconsideration following the dismissal of its complaint for failure to state a claim. The complaint was dismissed when it was held to indicate that the cause of action was time-barred as to the surety. There was no "notice" conversion of the Rule 12(b)(6) motion into a motion for summary judgment under Rule 56.

## FACTUAL AND PROCEDURAL HISTORY

This case arises out of a written construction contract between Fayetteville Investors, a North Carolina limited partnership (Fayetteville or "owner"), and Commercial Builders, Inc. (Commercial Builders or "contractor"), signed on April 24, 1985, to build a Quality Inn Hotel in Fayetteville, North Carolina at a cost of approximately $1.7 million. On the same date American Casualty Company of Reading, Pennsylvania (American Casualty or "surety") executed a performance bond in the same amount with Commercial Builders to guarantee the performance of the construction contract. By the terms of the contract, the construction was to be completed by November 24, 1985. The hotel opened for business on April 25, 1986, though there apparently remained serious problems with the building including: faulty caulking around the windows, excessive condensation in the rooms, defective sheetrock or improper hanging of good sheetrock in the hallways, problems with drainage around the structure, excessive "salting" of the brickwork, algae growths upon the brickwork, and problems with doors and light fixtures.

From May 1986 through October 1987, correspondence was carried on between the parties and their agents about these defects, with occasional corrective work being done on some of the problems during this period. Delays were encountered because of the Christmas 1986 holidays, a shortage of men or equipment of the contractor on the job site, correspondence delays, etc., though at all times during this period the contractor apparently indicated that it would make the necessary corrections or repairs. The contractor's superintendent visited the project in January 1987, and significant glass work was done by a subcontractor after March 4, 1987. On or about October 27, 1987, Commercial Builders by phone indicated that it would do no further work without additional payment.[1] By letter dated November 23, 1987, Fay-

---

1. Counsel for the general contractor and surety conceded, in oral argument, that the owner, Fayetteville Investors, was not at fault as to any corrections, defects, or payments.

etteville Investors notified the contractor and the surety of its intention to thus declare the contractor in default, pursuant to the terms of the construction contract and the performance bond. After a short period in which a conference was attempted to be set up between the parties, as required by the performance bond, on February 26, 1988 the investor group declared the contractor in default. In a second notice, on March 21, 1988, Fayetteville demanded that the surety perform its obligations under the performance bond within 15 days. The verified complaint was filed on February 29, 1989, about one year later.

On June 1, 1989, the trial court dismissed the action as barred as against the surety by the terms of the performance bond, which required that any such action be brought within two years. The court's dismissal was pursuant to a motion to dismiss filed by the surety. The court's ruling was premised upon the fact that the plaintiff's complaint had alleged that "the Contractor abandoned the project in June, 1986 and never completed construction," and the suit, not being filed until February 28, 1989, was thus apparently time-barred. This issue was contested by Fayetteville on various state law grounds including whether parties by contract could validly agree to a limitation period shorter than the statutory limitations period. It is agreed that at the hearing on the motion to dismiss there was no discussion of facts and that the issue argued was solely one of law.

Fayetteville appealed the dismissal of its complaint to this Court but, before the appeal was heard, American Casualty filed, in the district court, a motion for attorney's fees under Rule 11. American Casualty sought the sanctions based upon the plaintiff's filing of a facially time-barred complaint. Following the surety's motion for sanctions, the plaintiff, for the first time, attempted to introduce evidence of the correspondence and repair work done between June 1986 to November 1987. Such evidence would go to show that the contractor had not "abandoned" the site in June 1986, as alleged in the complaint, and that work

actually continued which would bring the suit within the time period. A ruling on sanctions was deferred pending appeal.

Subsequently, by an order entered January 12, 1990, the appeal was dismissed by the United States Court of Appeals for the Fourth Circuit as not having been taken from a final order. In the order this Court stated:

> Nothing we have said in this order, nor action we have taken by way of this order, will prevent the plaintiff from having the merits of its position ascertained upon a subsequent appeal. Neither should anything said or done here prevent the district court from the consideration on the merits of any further papers, or motions for reconsideration, or the like, which may be filed in this case in the district court.

Following the attempted first appeal, the plaintiff then filed a Motion for Reconsideration with the trial court on January 26, 1990 which sought to have the court reconsider its earlier dismissal of the complaint as against the surety. The grounds for reconsideration were the newly proffered evidence which would show that, despite the language in plaintiffs' complaint to the effect that contractor had "abandoned" work in June 1986, repair or corrective work in fact continued and default should not be held to have occurred until such was declared by the investor's group in February 1988. Such would bring the filing of this action within the contractual limitation period of two years.

With regard to the Motion for Reconsideration, the district court sought explanations from Fayetteville's counsel as to why the new evidence indicating later work, which brought the action within the limitation period, had not been presented prior to that time. Finding no such satisfactory explanations, the court treated the Motion for Reconsideration as a motion under Rule 54 concerning relief from orders which adjudicate fewer than all the claims in the action (the complaint was not dismissed as to the contractor[2]). To this motion the

---

**2.** We were told in oral argument that the same    law firm representing the surety was also serv-

district court applied Rule 60 standards, and hence, finding no excusable neglect, denied plaintiff's Motion for Reconsideration.

Plaintiff is now again before this court appealing the original dismissal of the complaint and the subsequent denial of reconsideration of the same dismissal in light of the proffered evidence tending to indicate a timely-brought suit.

## ANALYSIS OF PERFORMANCE BOND

■ Attached to the complaint "and incorporated herein by reference" are copies of the construction contract and the performance bond. We assume then, as did the district court, that the exhibits to the complaint are a part of the complaint which was subject to the motion to dismiss under Rule 12(b)(6) as filed by the surety. Rule 10(c), Fed.R.Civ.P. Since Rule 9(f) provides that allegations of time and place are material "for the purpose of testing the sufficiency of a pleading," 2A Moore's Federal Practice, ¶ 12.10 at 12–85, we conclude that the district court could consider the provisions of the contract and the terms of the performance bond in determining whether the complaint, on its face, demonstrates as a certainty that the claim is barred by the applicable limitation period. Indeed, in the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), Fed.R.Civ.P., the exhibit prevails. 2A Moore's Federal Practice, ¶ 10.06, p. 10–24.

In its order of June 1, 1989, the district court quoted from paragraph 9 of the performance bond, which states that any action on the bond "shall be instituted within two years after Contractor Default *or* within two years after the Contractor ceased working, *or* within two years after the Surety refuses or fails to perform its obligation under this Bond, whichever occurs first." The district court properly noted

that plaintiff advanced two arguments: (1) that since plaintiff was not a party to the performance contract (same being between the contractor and the surety), the plaintiff was not bound by the contractually imposed limitation period, and (2) that the claim for relief did not accrue "until the plaintiff complied with the numerous technical requirements of the performance bond."

The district court interpreted the principle of law guiding the lessening of the limitation period for filing an action on the performance bond to two years. *Pittsburgh Plate Glass Co. v. Fidelity & Deposit Co. of Maryland*, 193 N.C. 769, 773, 138 S.E. 143, 146 (1927). We find it unnecessary to agree or disagree with this conclusion which we leave to the North Carolina state court. However, as to the time when the plaintiff's claim under the bond accrued, the court, after pointing out that plaintiff cited no authority for its position, suggested that it would be ludicrous for plaintiff to contend that the limitation period did not begin to run until March 21, 1988, when plaintiff notified the surety that the contractor was in default. As the district court pointed out, this interpretation would place the triggering event for the commencement of the limitation period in the hands of the thirdparty beneficiary for whose benefit the performance bond was posted.

■ Paragraph 12.3 of the performance bond defines what is meant by the words "Contractor Default." It says, "Failure of the Contractor, *which has neither been remedied nor waived,* to perform or otherwise to comply with the terms of the Construction Contract." Since the performance bond was prepared or adopted by the surety,[3] any ambiguities in the interpretation of the performance bond must be construed against the party drafting or adopting the document—in this case, the surety.

ing as counsel for the contractor. This fact is conceded and is confirmed by an affidavit of a member of the law firm.

**3.** The surety uses a performance bond on private construction work which is from the American Institute of Architects (AIA) Document No.

A–312, a 1984 revision of Document No. A–311 adopted in 1970. It is the most widely used performance bond. *Handling Fidelity, Surety, and Financial Risk Claims,* (2d Ed.), § 6.3, p. 110).

One need only look at paragraph 3.1 of the performance bond to glean that it was always contemplated that a contractor would be afforded a reasonable time to comply with the terms of the contract in order to make repairs and corrections. Paragraph 3, applicable where there has been no default on the part of the owner (as is conceded in this case), says that the surety's obligation under this Bond shall arise *after*:

3.1 The Owner has notified the Contractor and the Surety at its address described in paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in subparagraph 3.1....

Following the foregoing wording, paragraph 4 provides that when the owner has complied with paragraph 3, the surety shall *promptly*, and at the surety's expense, do one of four things including the denial of liability in whole or in part and notifying the owner of its reason for denial of liability. The other three alternatives available to the surety are (1) to arrange for the contractor, with the consent of the owner, to perform and complete the Construction

Contract, (2) to undertake and complete the contract by itself, with the surety acting through agents or independent contractors, or (3) to obtain bids or negotiated proposals from contractors acceptable to the owner for the performance and completion of the construction contract, and pay to the owner the additional damages in excess of the contract price as is specified in paragraph 6, which latter would include correction of defective work, additional legal and delay costs resulting from the Contractor's Default as well as from the actions or failure to act by the surety under paragraph 4 which required the surety to act promptly; all to be within the principal amount of the bond.

■ Bearing in mind that paragraph 9 has specified three events marking the time when any action on the bond must be instituted (and the bond provides for the earliest of these events to be the triggering date), it seems apparent that we cannot avoid the clear definition of the words "Contractor Default" under paragraph 12.3 of the performance bond. We cannot agree with the district court in saying that the owner's notification of "Contractor Default" could not be the triggering event to commence if the contractor had been attempting to remedy the defects or omissions in his work.[4]

As the evidence, when and if introduced, will apparently show that the contractor did work on the project after June 1986 (the date that counsel for the plaintiff, for some unknown reason, alleged that the contractor had *abandoned* the project), the district court would not be correct if that is a proven fact. In the leading case of *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), we are warned that a motion to dismiss should not be granted unless the plaintiff can *prove no set of facts* which would entitle him to relief. In

---

4. No bonding company wants to see the contractor go down the drain. Every effort is made to keep the contractor in business. Without provisions for encouraging remedial steps, the Contractor's Default could take place at almost the same time as the contract is executed. Nor does the owner enjoy suing a contractor and the surety as soon as the contractor violates some term of the construction contract. With the legal fees as they now exist if any clear violation of the construction contract merits, without more, an action on the performance bond, it would result in substantial financial losses to all parties.

our case, *Conley* is especially appropriate where it says that "the Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Id.* at 48, 78 S.Ct. at 103. Plaintiff's counsel has conceded that the use of the word "abandonment" was a poor choice of words, but without hearing the evidence as to when and under what conditions the work was performed after June 1986, we cannot say, as a matter of law, whether and when the contractor "ceased working," as provided in paragraph 9.

The third provision of paragraph 9 does not refer to the contractor and refers only to the surety in saying: "or within two years after the Surety refuses or fails to perform its obligations under this Bond." It was Fayetteville's letter of November 23, 1987, which complied with paragraph 3.1 of the performance bond. That letter, as noted, stated that Fayetteville was considering declaring a "Contractor Default," and was sent to both the contractor and surety. It was between November 11, 1987 and November 23, 1987 when plaintiff's attorney first learned of "the technical requirements in order to hold the surety liable." Fayetteville specifically referred to paragraph 3.1 of the performance bond and stated that it was considering declaring the contractor in default. Fayetteville also requested a conference with both the contractor and the surety to discuss methods of performing the contract with the construction company, and proposed a conference at the project on December 14, 1987, at 2:30 p.m. This letter produced a

response by the surety, dated December 2, 1987, stating that the contractor was financially solvent and capable of handling its obligations without the intervention of the surety.[5] Thereafter, by letter dated February 26, 1988, Fayetteville made a declaration of "Contractor Default," addressing the letter to both the principal and surety. More than fifteen days later, on March 21, 1988, Fayetteville wrote to the surety (this letter was written by Fayetteville Investors, not by its attorney) stating that the surety would have fifteen days within which to commence performance of the surety's obligations under the bond.

It is clear, therefore, that until this action was instituted and the surety filed its answer to the complaint a few days after February 28, 1989, the surety had never refused to perform its obligations under the performance bond,[6] although the surety may have failed to perform its obligations when it wrote its "brush-off" letter of December 2, 1987. In any event, if this letter constituted a failure to perform its obligations on the part of the surety, the date is within two years from the time of the institution of the action and, therefore, not time-barred for this reason.

We hold that the district court failed to give a proper interpretation and analysis of the terms of the performance bond in ruling, as a matter of law, that the owner's claim was time-barred.

## THE CONSTRUCTION CONTRACT

■ The use of an AIA form carries over to the construction contract between the owner and contractor. It is necessary for a court to consider the terms of the

---

5. This response by the surety, if correctly stated in Fayetteville's letter of February 26, 1988, does not constitute compliance with paragraph 4 of the performance bond. The surety was required to act *promptly* as to one of four alternatives. Neither alternative was provided in the "brush-off" which the surety gave to the owner. Since the surety and the contractor are jointly and severally liable to the obligee/owner the surety cannot deny a claim merely on the basis that the contractor is solvent. *Handling Fidelity, Surety and Financial Risk Claims,* (2d Ed.), § 6.1, p. 107.

6. The record (joint appendix) on the first appeal as presented to this Court does include the General Conditions, specifically section 14.2.1 which refers to the right of the owner to terminate the contract. This may have given rise to a termination on October 29, 1987 when the contractor stated that it would not return to work on the job unless paid extra. We refrain from commenting further and leave this matter to the district court to whom we must again remand the case. The General Conditions, if a part of the Construction Contract, were incorporated by reference into the performance bond.

construction contract that the surety promises to perform since the terms of the construction contract are read into the bond. *Handling Fidelity, Surety, and Financial Risk Claims*, (2d Ed.), § 1, p. 107–108. Indeed, the surety can only be obligated to perform under the bond to the extent that the principal is obligated under the construction contract. *Id.* § 6.5, p. 112, 113. Paragraph 1 of the performance bond incorporates therein by reference the Construction Contract.

We have examined the construction contract between Fayetteville (the owner) and Commercial Builders, Inc. (the contractor) and find nothing of consequence with respect to the remedies against the surety. Article 3 provides that "Time is of the essence of this Contract." Therefore, there was a failure to perform by the contractor as of November 24, 1985 when the project was to have been substantially completed but, of course, this is not the same as a "Contractor Default." There is a further notation under Article 3 specifying that "The General Contractor's bonding company will require written verification that the funds are available for payment of this contract," and the name and address of the bonding company's writing agent was typed in Article 3. Since the performance bond was dated the same day, *i.e.* April 24, 1985, it stands to reason that the surety had obtained the required written verification prior to executing the bond.

It is interesting to note the caption pages on the construction contract and on the performance bond. Both are AIA standard forms. As to the performance bond, in the upper left-hand corner there appear the letters "CNA," apparently a parent company owning or controlling the American Casualty Company of Reading, Pennsylvania, the name of the surety executing the bond. On the other hand, the *Standard Form of Agreement Between Owner and Contractor* does not show the same lettering in the upper left-hand corner, nor do the letters "CNA" appear therein except under the writing agent's name in Article 3. It is not unlikely that the bonding company has not used the CNA lettering in the construction contract as the surety did not wish to have the construction contract construed more strongly against the surety in the event of ambiguity but, at the same time, recognized that this construction would apply with respect to the performance bond because an AIA form has been adopted as the surety's form whereas it can scarcely be argued that the surety is responsible for the drafting of the original construction contract.

We conclude that there are no provisions of the construction contract which would limit, restrict or enlarge upon the remedies afforded by the performance bond, other than the fact that time is expressly made the essence of the agreement.

## PROMPTNESS

After the owner has complied with paragraph 3 of the performance bond, paragraph 4 requires the surety to promptly take one of four alternatives. Neither of the four took place in this case.

It is stated in § 6.6 of *Handling Fidelity, Surety and Financial Risk Claims*, (2d Ed.), as follows:

When the principal [contractor] is declared in default by the obligee [owner], the usual procedure is for the obligee [owner] to make a claim against the surety to force performance of the contract in accordance with the performance bond. When this occurs, the surety must investigate the matter as rapidly as possible to avoid additional exposure and risk.

The surety's obligation to the obligee [owner] demands that the surety promptly investigate the claim, as set forth in the Surety Association of America's nonbinding "Guiding Principles for Claims Handling."

The latter document states that the surety shall—

1. Promptly acknowledge communications relating to a claim.

2. Promptly undertake an appropriate investigation to determine its liability.

3. Promptly advise claimants [owner] of its position, based upon its investigation.
4. Promptly offer settlement of claims when liability becomes reasonably clear.
5. Promptly provide the specific basis for denial of a claim.
6. Promote adherence to these principles by its employees, attorneys, and consultants.

Jensen, *Delivering the Promise*, 11 Suretyscope 13 (1987).[7]

As no evidence has been presented and as yet considered by the district court on this issue, we need not refer to the compliance or failure of compliance on the part of the surety.

## THE POST–REMAND PROCEEDINGS

When this matter was first heard in this court, at which time the appeal was dismissed for lack of a final judgment, Circuit Judge Widener, the presiding judge, wrote the last paragraph in the remand order which has been .heretofore quoted. The plain inference from this quotation is that, while we could not either affirm or reverse because of the lack of a final judgment which was not appealable, it was expected on remand that the district court would then give "consideration on the merits of any further papers, or motions for reconsideration, or the like, which may be filed in this case in the district court."

It is quite true that the action of the district court in dismissing the complaint against the surety on June 1, 1989 was not reversed, vacated, or affirmed by this Court when it dismissed the appeal, because there was no final judgment. This was one of the reasons for inserting the last paragraph of our order of January 12, 1990 when the appeal was dismissed and the case remanded. When we examined the original complaint and the three perti-

nent letters attached thereto and specifically referred to in the complaint, same being Ex. C (the letter dated November 23, 1987 from the attorney for the owner to the contractor and the surety), Ex. D (letter dated February 26, 1988 from the attorney for the owner to the contractor and surety), and Ex. E (a letter from the owner's Lee Manning to the surety dated March 21, 1988), we realized that an isolated and erroneous factual allegation by the attorney for the plaintiff could never give rise to a dismissal under Rule 12(b)(6) on the ground that the action was time-barred. Since the merits of the case and the complaint have not yet been explored, we are still presented with essentially the same issue, but in a slightly different form.

■ After the owner filed its Motion for Reconsideration, the district court became concerned with the particular rule under which the motion was filed. Apparently, the owner, because of a Local Rule in the Eastern District of North Carolina requiring a reference to the rules or statutes under which a party is seeking action on a motion, requested reconsideration under Rules 59(e) and 60(b), Fed.R.Civ.P. The district court, by order dated March 7, 1990, held that the motion for reconsideration was not timely under Rule 59(e), but was timely for purposes under Rule 60(b). As the district court states "Rule 60(b) affords relief only from a judgment, order, or proceeding which is *final*." Since the Court of Appeals dismissed an appeal from the order of June 1, 1989 because the order was not final, Rule 60(b) was not available for relief from an interlocutory order. Rule 59(e) is equally applicable only to a final judgment.

■ An interlocutory order is subject to reconsideration at any time prior to the entry of a final judgment. This district court concluded that the appellant's motion should have been filed pursuant to Rule

---

**7.** There was a time when, if the project was "bonded," this was all that the owner need know. That no longer exists. Insurance companies have engaged the services of draftsmen-probably attorneys—whose purpose is to make the policy, bond or contract so complex that it will require hours of study, and compliance with many preliminaries, prior to perfecting a valid claim. The Guiding Principles for Claims Handling are more observed in the breach than in observance thereof.

54(b) which, after mentioning that a final judgment can be entered "as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment" (not done in this case prior to the first appeal), states:

In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and *the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

We cannot find fault with the district court's finding that the Motion for Reconsideration should be considered under Rule 54(b) as a review of a prior interlocutory order.

■■■ It is with the district court's adoption of a Rule 60(b) standard controlling the district court's ruling on the reconsideration of the order of June 1, 1989, with which we vigorously disagree. Some authorities hold that a revision of an interlocutory order "is not subject to the restrictive provisions of Rule 60(b)," citing *Gagne v. Carl Bauer Schraubenfabrick,* 595 F.Supp. 1081, 1083–84 (D. Maine 1984); *Covey v. CIT Corp.,* 71 F.R.D. 487 (E.D.Okla. 1975); *Beeman v. Safeway Stores, Inc.,* 724 F.Supp. 674 (W.D.Mo.1989). In *Gridley v. Cleveland Pneumatic Co.,* 127 F.R.D. 102 (M.D.Pa.1989), the court, while agreeing that it was not bound by the strictures of Rule 60(b), used parts of the rule in determining whether the movant's earlier failure to produce a pamphlet defining an ambiguous term in an insurance policy resulted from mistake, inadvertence, or excusable neglect. The *Gridley* court held that movant's counsel had been "neglectful, but excusably so," and reconsidered its prior ruling on *summary judgment.* In the instant case, the district court followed this discussion by a rather

amazing statement in his order of July 16, 1990, after first giving the parties a right to submit further authorities, said statement reading in part:

In its supplemental response, plaintiff again discusses the substance of its subsequent submissions and argues that this court has plenary power to afford such relief from its orders as justice may require. However, plaintiff fails to explain why these submissions were not made in response to American Casualty's motion to dismiss. Indeed, plaintiff offers no reason why the court should consider the evidence it now proffers.

A party should not be permitted to use a motion to reconsider as a vehicle to introduce additional evidence which could have been adduced during the pendency of the prior motion.... Dispositive motions serve judicial economy by encouraging parties to winnow out extraneous issues. To compel their cooperation in this process, litigants face the dismissal of claims which are not adequately supported by the early and full disclosure of all material facts. This system is compromised if courts allow litigants to control the time at which evidence will be produced.

Here, plaintiff has made no showing that the evidence it now proffers is newly discovered, or was overlooked through mistake, inadvertence, or excusable neglect. Instead, plaintiff has maintained complete silence as to why this evidence was not presented in response to American Casualty's motion to dismiss. Although the court recognizes that it is not bound by the letter of Rule 60(b), defendant's motion to dismiss would be made meaningless if the court were to allow plaintiff to make additional submissions without some explanation for its failure to present this evidence at the appropriate time.

Because plaintiff has offered no explanation as to why the evidence and arguments now proffered were not adduced in response to American Casualty's motion to dismiss, plaintiff's motion for reconsideration is denied.

Thus, by these words, the district court has made it mandatory for a plaintiff to come forward with all facts of the case whenever a defendant files a motion to dismiss under Rule 12(b)(6) for the purpose of testing the sufficiency of the complaint.

Rule 12(b) sets forth that seven (7) stated defenses may, at the option of the pleader, be made by motion. Among these defenses, number (6) pertains to the "failure to state a claim upon which relief can be granted." Stated otherwise, defense number (6) tests the sufficiency of the complaint. Later in Rule 12(b)(6) it is stated:

> If, on a motion asserting the defense number (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, *and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.*

The record [8] does not reflect any conversion, or attempted conversion, of the Rule 12(b)(6) motion into a Rule 56 summary judgment. What is the necessity of the above-quoted words of Rule 12(b)(6), if the burden is upon the plaintiff on a motion to dismiss, to come forward and present all of the facts of a case?

A motion to dismiss for failure to state a claim upon which relief can be granted performs substantially the same function as the old common-law demurrer. Because a dismissal under Rule 12(b)(6) is accorded res judicata effect, such dismissals are generally disfavored by the courts. 2A Moore's Federal Practice, ¶ 12.07 [2.–5], p. 12–63. Not infrequently on hearings on motions to dismiss under Rule 12(b)(6), attorneys are prone to recite facts which are outside the scope of the pleadings. The practice led to a "speaking demurrer" and, after demurrers were abolished in the federal system, Rule 12(b)(6), with its conversion right, including a required notice to the parties, took the place of a speaking demurrer.[9]

At least since the early 1970's following the decision of the Supreme Court in *Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972),[10] the Fourth Circuit has strictly applied the "reasonable opportunity" requirement of Rule 12(b)(6). In *Johnson v. RAC Corporation*, 491 F.2d 510, 513–14 (4th Cir.1974), the Court, quoting from *Dale v. Hahn*, 440 F.2d 633, 638 (2d Cir.1971), said:

> "It seems fair to include within the term 'reasonable opportunity' some indication by the court to 'all parties' that it is treating the 12(b)(6) motion as a motion for summary judgment," with the consequent right in the opposing party to file counter affidavits or to pursue reasonable discovery. This was the procedure followed in *Barnes v. A. Sind & Associates* (D.C. Md.1963) 32 F.R.D. 39, 41, rev.

---

**8.** At argument before this Court counsel were asked whether either party or the district judge himself had discussed the conversion of the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. Each answered in the negative.

**9.** The surety states in its brief that Rule 12(b)(6) *permits* a party to defend a motion to dismiss by presenting evidence. However, what the surety purposefully avoids is that such permission is available only after notice that the court intends to convert the Rule 12(b)(6) motion into a Rule 56 motion, which was not done (and has not yet been done) in this case.

**10.** In *Carter v. Stanton, supra,* it is said:

> But it appears that at the hearing on the motion to dismiss, which was based in part on

the asserted failure "to state a claim upon which relief can be granted" (App. 19), matters outside the pleadings were presented and not excluded by the court. The court was therefore required by Rule 12(b) of the Federal Rules of Civil Procedure to treat the motion to dismiss as one for summary judgment and to dispose of it as provided in Rule 56. Under Rule 56, summary judgment cannot be granted unless there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. If this is the course the District Court followed, its order is opaque and unilluminating as to either the relevant facts or the law with respect to the merits of appellants' claim.

Of course, in the instant case, we do not have a transcript of any oral arguments of counsel before the district court at the hearings conducted in this case.

on other grounds (4th Cir. [1965]) 341 F.2d 676, where, after noticing "all parties" that it was treating the motion as one for summary judgment, gave the opposing party the right to "file his counter affidavits within 15 days after he has completed discovery."

In the same vein, we find *Plante v. Shivar*, 540 F.2d 1233 (4th Cir.1976); *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975); and *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir.1979). In the last two cited cases, pro se plaintiffs were involved and the opinion urged the district courts to make an explanation to the pro se party beyond the giving of a mere notice of conversion. In each of these cases where a motion to dismiss the complaint was the issue, the Fourth Circuit consistently held that the district court could not act upon facts alleged or proven beyond what was stated in a complaint or amended complaint.

The foregoing discussion is sufficient for our purposes in finding error and remanding the orders of June 1, 1989 and March 7, 1990. As the case now stands, without more, Fayetteville has filed its complaint and the surety has pending a motion to dismiss the complaint. If facts outside the complaint are to be considered, either party or the district court, *sua sponte*, shall cause an order to be entered converting the motion to dismiss into a motion for summary judgment, and thereafter proceed under Rule 56 unless the motion to dismiss is withdrawn by the surety.[11]

## THE STRICTURES OF AN INTERLOCUTORY REVIEW OF A PRIOR ORDER

We believe it unnecessary to thoroughly express our views on the interplay of Rules 60, 59 and 54. The district court correctly held that Fayetteville's motion for reconsideration could not be treated under Rules 60 or 59, as these rules apply only to final judgments, and the remand order of January 12, 1990 expressly found that the judgment order of June 1, 1989 was *not* a final judgment. It was, therefore, an interlocutory order which, as the district court stated, could be reviewed by the district court, on motion or *sua sponte*, at any time prior to the entry of a final judgment. While it is not necessary to label under a particular rule number a motion for reconsideration of an interlocutory order, the district court considered the motion for reconsideration as a motion for the revision of an interlocutory order under Rule 54(b). Despite the fact that, generally at least, a review of an interlocutory order under Rule 54 is not subject to the restrictive standards of motions for reconsideration of final judgments under Rule 60, the district court saw fit to apply Rule 60 strictures and found that the plaintiff had failed to present evidence at an earlier date on the limitations issue and, since plaintiff had no excuse, the motion for reconsideration was denied.[12]

---

**11.** Because the terms of the construction contract and the performance bond may vary in some factual situations, especially with respect to when the surety's obligation accrues, an ambiguity may arise as to the interpretation of the two contracts. Moreover, it appears that counsel for Fayetteville did essentially all of the correspondence and telephone conversations for his client, and the surety's law firm did all of the correspondence and telephone conversations, as well as perhaps the decision-making, in behalf of the surety. District courts should not be subjected to testimony given by an attorney participating in the trial. While this caveat, as applied to this case, is probably applicable only to the motion to dismiss if converted to a motion for summary judgment, counsel should carefully review their own prior participation to determine the ethics of continued participation if the case is not promptly settled.

**12.** The authorities cited by the district court, to support the right to exact a form of sanction or penalty by imposing strictures for violating numbered rules, do not profess to claim that the rules authorize such action. Furthermore, the cases cited almost universally are opposed to what the district court did in this case, *i.e.,* dismissed the action for the failure to promptly present all the facts in response to a motion to dismiss. Whatever may be the authority to impose strictures in other situations, the action of the district court in this case could never be approved as Fayetteville was not permitted to present facts outside the pleadings unless there had been a conversion order under Rule 12(b)(6). The matter came to light when, after Fayetteville had noted its appeal from the order of June 1, 1989, the surety filed a motion for attorney's fees pursuant to Rule 11, Fed.R.Civ.P. It was at that time, for the purpose of opposing the surety's Rule 11 proceeding, Fayetteville had its first opportunity to fully disclose the facts pertaining to the contractor's defective work, when corrections or repairs were made, and the

In 7 Moore's Federal Practice, ¶ 60.20, p. 60–170, after stating that Rule 60(b) is applicable only to a final judgment, order or proceeding, it is plainly said:

> Interlocutory orders and judgments are not within the provisions of 60(b), but are left within the plenary power of the Court that rendered them to afford such relief from them as justice requires.

Further, in the same treatise and volume, at paragraph 60.20, p. 60172, in discussing the revision of an order at any time prior to final judgment, the author states:

> Such a partial adjudication would not, therefore, be subject to the restrictive provisions of Rule 60(b).

■ The procedural posture of this case never suggested that Rule 60(b) would be applicable. Fayetteville's case against the surety did not involve a matter of newly discovered evidence as Fayetteville's counsel was hired in May 1987, and presumably counsel had all information then available to the owner, and thereafter whatever happened was known essentially through the correspondence, plus a few telephone conversations. The district court apparently labored under the belief that Fayetteville's counsel was endeavoring to withhold relevant facts when counsel did not directly respond to the court's inquiry as to how long counsel had possessed the information later revealed in opposing the motion for Rule 11 sanctions and, subsequently, after the remand order of January 12, 1990. From a reading of the post-remand order of March 7, 1990, it would intimate that the district court, had it known all the facts at the time the court wrote the order of June 1, 1989, probably would have denied the surety's motion to dismiss or, if converted to a Rule 56 motion, would have accorded like treatment to a motion for summary judgment. The responsibility for getting all the facts of a case into a hearing on a motion to dismiss, without converting the Rule 12(b)(6) motion into a Rule 56 motion, is the joint responsibility of counsel and the court. As stated in 2A Moore's Federal Practice, ¶ 12.07 [2.–1], p. 12–48, in discussing the crucial distinction between Rule 12(b)(1) and Rule 12(b)(6), the author states: "In the latter instance [Rule 12(b)(6) ], materials outside the complaint may not be considered unless the motion is converted to one for summary judgment. Consideration of such material does not convert a Rule 12(b)(1) motion into one for summary judgment." Unless waived by the parties, or unless the parties are otherwise estopped, the intermingling of a motion to dismiss for the facial reasons apparent on the face of the complaint and the factual reasons outside of the complaint which are subject to review on a motion for summary judgment, can cause confusion. If the courts want facts outside the pleadings to be given in *all* cases where a motion to dismiss is filed, it may adopt this practice in all cases but, without more, it is not the duty of a plaintiff to come forward with the facts of the case as soon as a motion to dismiss is filed and served.

The most apposite case from the Fourth Circuit is *Dickey v. Greene*, 729 F.2d 957 (4th Cir.1984), where, in a Title VII action, defendants asserted in their motions to dismiss that the EEOC complaint had been filed against the wrong agency and, therefore, the jurisdictional prerequisites had not been satisfied. The magistrate judge, to whom the case was referred for a recommendation, suggested a dismissal of the action and the district court entered its judgment of dismissal. In reversing, by an en banc divided opinion, the Fourth Circuit noted that there was nothing in the record to indicate that the motions to dismiss were being treated as motions for summary judgment. Thus, said the Circuit, the magistrate judge should have limited himself to a consideration of whether plaintiff's allegations, standing alone and taken as true, pleaded jurisdiction and a meritorious cause of action.

## CONCLUSION

For the foregoing reasons the judgment of the district court denying Fayetteville's

---

various notices which were given to the contractor and the surety. The district court deferred action on the Rule 11 sanction motion pending the outcome of the appeal then pending. We assume that, in light of this opinion, there will be no further difficulty in disposing of the Rule 11 motion.

motion for reconsideration is reversed as being erroneous, and the case is hereby remanded for further proceedings.

REVERSED AND REMANDED