**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JEFFREY M. BROWN ASSOCIATES,
INCORPORATED,

      *Plaintiff-Appellant,*

v.

ROCKVILLE CENTER, INCORPORATED;
PAVILION PARTNERS, INCORPORATED,

      *Defendants-Appellees.*

No. 00-1763

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, District Judge.
(CA-99-3514-S)

Argued: January 25, 2001

Decided: April 3, 2001

Before WILKINSON, Chief Judge, WILKINS, Circuit Judge, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

### COUNSEL

**ARGUED:** Timothy Francis Brown, ARENT, FOX, KINTNER,
PLOTKIN & KAHN, PLLC, Washington, D.C., for Appellant. Mar-
tin Joseph Jaron, Jr., HOLLAND & KNIGHT, LLP, Washington,
D.C., for Appellees. **ON BRIEF:** Barbara G. Werther, ARENT,

FOX, KINTNER, PLOTKIN & KAHN, PLLC, Washington, D.C., for Appellant. C. Dennis Southard, IV, HOLLAND & KNIGHT, LLP, Washington, D.C., for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

This case involves a dispute over a construction contract between Plaintiff-Appellant Jeffrey M. Brown Associates, Incorporated ("JMB"), and Defendants-Appellees Rockville Center, Incorporated ("RCI") and Pavilion Partners, Incorporated ("PPI"). The district court dismissed JMB's amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and JMB appeals. For the reasons discussed below, we affirm.

I.

JMB is a general contractor that designs and builds construction projects.[1] In 1997, it entered into a "fast track" contract (the "Contract") with RCI, to design and build a retail pavilion and theater on land RCI owned in Rockville, Maryland. RCI later conveyed the land to PPI. Under the Contract, JMB was to be paid its actual cost and a 5.1% fee, not to exceed a Guaranteed Maximum Price ("GMP"). The Contract provided that "time was of the essence," (J.A. at 455), because the defendants had to meet an occupancy schedule for their incoming tenants. (*See* J.A. at 467.)

Work began in January 1997. JMB completed enough work on the

---

[1]The facts are taken from the amended complaint and from the exhibits attached to it, or to which it refers and relies upon. (See Part II.A, note 2, and the text accompanying note 2, *infra*.)

theater portion of the project to receive a temporary occupancy permit from the city, while work on the retail portion of the project continued. At some point, disputes arose concerning the quality of JMB's work and delays in construction. RCI filed a demand for arbitration, alleging breach of contract.

RCI hired consultants to determine the scope of the deficiencies and to recommend solutions. After a seven-month review of the building structure, the consultants prepared a "Deficiency List," which identified many construction defects, including problems with the glass exterior walls on the east end of the retail pavilion ("curtain walls"). The Deficiency List did not specify what remedial work was required to fix the curtain walls.

To ensure completion of the project and to settle the arbitration, the parties entered into a "Amendment to Contract and Partial Settlement Agreement" ("Settlement Agreement") on August 3, 1999. Under the Settlement Agreement, the defendants agreed to dismiss their arbitration demand, and JMB agreed to complete its work—including the Deficiency List items—by a fixed date.

Specifically, JMB had to achieve "Substantial Completion" of its work within ninety days of the Settlement Agreement's effective date, *i.e.* by November 1, 1999. A fifteen-day "cure period" allowed JMB to cure any breaches by November 16, 1999, which also was the date JMB had to achieve "Final Completion."

"Substantial Completion" was defined as:

> (1) all Work must be completed and must be accepted by RCI and PPI . . . with the exception of minor punch list work, for which the cost to complete shall not exceed $25,000 (the punch list content and cost to complete shall be determined by Warner [Construction Consultants, Inc., RCI's consultant] . . .);

> (2) all other conditions of the Contract, as amended, including but not limited to all conditions of this Agreement, must be met by JMB; and

(3) all necessary governmental building, inspection and other approvals, certifications, temporary (but not final) certificate of occupancy, and permits and permissions for any and all Work (including but not limited to the corrective and remedial work as set forth in the Deficiency List), must be obtained and all Work must be completed by JMB and accepted/approved by the City of Rockville.

(J.A. at 346-47.)

"Final Completion" was defined as "having achieved Substantial Completion plus completion of all punch list work *and issuance of a final certificate of occupancy for the Project from the City of Rockville* . . . within one hundred and five (105) days of the effective date of this Agreement," (J.A. at 348 (emphasis added)), *i.e.* by November 16, 1999.

The Settlement Agreement provided that JMB "expressly acknowledges that if it fails to achieve Final Completion within the aforesaid time period it shall be in default and may be terminated with no notice or opportunity to cure." (J.A. at 348.) The parties again agreed that "time [was] of the essence." (J.A. at 368.)

"If" JMB met all of its deadlines and other obligations under the Settlement Agreement, (J.A. at 356), the parties agreed that the GMP would be stipulated to be approximately $14 million. The parties further agreed that the defendants already paid JMB approximately $12 million, and that the balance of the stipulated GMP was approximately $1.4 million, which the defendants placed in escrow.

JMB did not have the right to withdraw the escrowed funds "unless and until" JMB satisfied "all requirements of the [Settlement Agreement]," which requirements were "understood to be express conditions precedent to payment." (J.A. at 359.) "If" and "only when" JMB performed the conditions precedent, (J.A. at 361, 359), the defendants would disburse the escrowed funds to JMB. However, the parties agreed that "in the event of a default by JMB," JMB would not be entitled to the escrowed funds, and the escrow agent would "immediately and without further notice" return the escrowed funds to the defendants. (J.A. at 361, 376.)

JMB promptly began working on the Deficiency List. In September 1999, the parties met at the site with the curtain wall consultants and manufacturer. The manufacturer said the installation was satisfactory, with minor modifications that could be accomplished by the November deadlines. The defendants' consultant subsequently notified JMB that it preferred remedial work far beyond the minor work identified by the manufacturer. JMB thought the extra work was unnecessary, but the defendants insisted JMB perform the added work. The defendants would not extend the time deadlines prescribed by the Settlement Agreement.

On November 1, 1999, the defendants notified JMB that it had not achieved "Substantial Completion." This triggered the 15-day cure period, which meant JMB had to achieve both "Substantial" and "Final" Completion by November 16. On November 12, the city inspectors sent JMB an inspection report approving the project for occupancy. On November 14, RCI's consultant (Warner) prepared a report indicating that $36,000 in "punch list" work remained as of that date. On November 16—the final deadline date—the city's chief inspector wrote a letter to the defendants to say that a final certificate of occupancy would not be issued until a defect in an expansion joint was repaired.

Based on the chief inspector's letter and on Warner's report, the defendants deemed JMB to be in default. The defendants claimed that they had no obligation to release to JMB the $1.4 million in escrowed funds, that liquidated damages were accruing, and that JMB was required to assign to them any claims JMB had against its subcontractors and designers. Despite JMB's willingness to work into the evening hours, the defendants ordered it off the site and refused to allow it to do any additional work.

JMB sued the defendants in the United States District Court for the District of Maryland on November 19, 1999. The amended complaint asserts five claims for relief: (1) breach of contract; (2) declaratory judgment; (3) conversion; (4) *quantum meruit*; and (5) unjust enrichment. On May 22, 2000, the district court granted the defendants' motion to dismiss all counts pursuant to Rule 12(b)(6), and dismissed the case.

JMB filed a timely notice of appeal on June 9, 2000. It appeals the dismissal of the first three counts of its amended complaint, but does not appeal the dismissal of its *quantum meruit* and unjust enrichment claims.

## II.

## A.

We review a Rule 12(b)(6) dismissal *de novo*, and accept as true the facts alleged in the amended complaint. *See Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). We also accept as true the facts set forth in the exhibits attached to the complaint. *See* Fed. R. Civ. P. 10(c); *Eastern Shore Mkts.*, 213 F.3d at 180 (examining lease attached to complaint). While construing those facts in a light most favorable to JMB, we need not accept as true "the legal conclusions drawn from the facts. . . . [or] unwarranted inferences, unreasonable conclusions, or arguments," *id.*, such as conclusory allegations in the complaint that are contradicted by the attachments. *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c) . . . the exhibit prevails."); *see also Sprewell v. Golden State Warriors*, 231 F.3d 520, 528 (9th Cir. 2000) (holding that, by attaching arbitration agreement to complaint, the plaintiff "ple[d] himself out of a claim by including unnecessary details contrary to his claims"). It is with these principles in mind that we examine the sufficiency of JMB's amended complaint.

## B.

JMB first assigns error to the district court's consideration of allegations in the original complaint to dismiss the amended complaint. "As a general rule, an amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) (citation and internal quotation marks omitted). We agree with JMB that the district court should not have considered allegations in the original complaint to dismiss the amended complaint. *See Kelley v. Crosfield Catalysts*, 135 F.3d 1202, 1204-05 (7th Cir. 1998). The error is harmless, however,

because our own *de novo* analysis of the amended complaint shows JMB failed to state any claim upon which relief can be granted.

We note that although we do not herein consider the *allegations* of the original complaint, we *may*, and do, consider certain *exhibits* attached to the original complaint that are "integral to and explicitly relied on in the [amended] complaint," and whose authenticity is not challenged, *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999), such as the Settlement Agreement and Deficiency List.[2] Our consideration thereof is consistent with the above-stated principle regarding the superceding effect of an amended pleading. Such exhibits are not superceded if the amended complaint effectively integrates them. Moreover, our consideration of exhibits that were attached to the original complaint, omitted from the amended complaint, but still referred to, integral to, and relied upon in the amended complaint, furthers the policy of "[p]reventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting . . . documents upon which their claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *cited in Phillips*, *supra*.

## C.

JMB next argues that the district court erred in dismissing its breach of contract claim. The amended complaint alleges the defendants breached the Contract, as amended by the Settlement Agreement, by terminating JMB and by refusing to pay JMB the escrowed funds. The district court held that JMB's breach of contract claim was "fatally contaminated" by JMB's admissions that it was itself in breach of the Settlement Agreement, by failing to achieve "Substan-

---

[2]JMB intended to attach certain exhibits to the amended complaint, but, apparently through inadvertence, attached them only to the original complaint. To its amended complaint, JMB *purported* to attach: (1) the original Contract; (2) the Deficiency List; (3) the Settlement Agreement; and (4) the city inspectors' November 12 inspection report. However, JMB *actually* attached the following to its amended complaint: (i) the original Contract; (ii) Warner's November 14 report; and (iii) the Escrow Agreement. As is obvious, JMB intended to attach to its amended complaint exhibits such as the Settlement Agreement and Deficiency List, but simply failed to do so.

tial" or "Final" Completion by November 16. JMB's principal argument on appeal is that it sufficiently alleged it achieved "Substantial Completion" by November 16, and thus, should have been paid the escrowed funds.

We find JMB's argument unpersuasive. The dispositive inquiry is not whether JMB sufficiently alleged it achieved "Substantial" Completion, but whether it sufficiently alleged it achieved "Final" Completion. To achieve "Final" Completion, JMB was contractually required to obtain a "final" certificate of occupancy by November 16. (*See* J.A. at 346, 348.) JMB admitted in its amended complaint that it did not obtain a final certificate of occupancy by November 16. (*See* Am. Compl. ¶ 24, J.A. at 424-25.) Therefore, under JMB's own allegations, as supplemented by the documents it attached to the complaint, JMB did not achieve Final Completion.[3]

JMB alleges it failed to achieve Final Completion only because the defendants expanded the scope of work contemplated by the Settlement Agreement, and that, as a result, "[t]ime extensions per the Contract and the [Settlement] Agreement would change the actual dates for the milestones planned for November 1 and November 16." (Am. Compl. ¶ 16, J.A. at 422.) Because the latter proposition is a legal conclusion that is contradicted by the contracts *sub judice*, we do not accept it as true. The Settlement Agreement contains no provisions by which time could be extended, apart from the "cure" period provision, which period ended on November 16, 1999. The original Contract contains only one provision expressly governing extensions of time. That provision states that if "changes ordered in the Work" caused JMB to be delayed, time limits could be extended "by Change Order." (J.A. at 455-56.) A Change Order was defined as "a written instrument prepared by [JMB] and signed by [JMB and the defendants], stating their agreement upon . . . the extent of the adjustment, if any, in the Contract Time." (J.A. at 459.) Assuming *arguendo* that the time extension provision of the original Contract survived the amendment, JMB did not allege in its amended complaint or in its briefs that it obtained a Change Order to which the parties had agreed. Because the only means by which time could be extended under the time exten-

---

[3]Counsel for JMB conceded this point at oral argument when he said there is "no question we weren't finally complete."

sion provision was by "Change Order," JMB did not sufficiently allege that the time limits could be extended.

In the alternative, JMB contends the defendants owed an implied duty, such as the implied duty of good faith and fair dealing, to extend the time limits. In Maryland, the implied duty of good faith and fair dealing "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract," *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 182-83 (4th Cir. 2000) (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992)). JMB argues it has a viable claim that the defendants breached this duty by expanding the scope of the curtain wall work, preventing JMB from performing its obligations within the allotted time period. We disagree.

Under Maryland law, implied duties cannot act as a substitute for express contractual terms and cannot change the terms of the contract. *See, e.g.*, *Suburban Hosp., Inc. v. Dwiggins*, 596 A.2d 1069, 1076-77 (Md. 1991) (declining to extend an implied covenant of good faith and fair dealing to an at-will employment contract); *Waller v. Maryland Nat'l Bank*, 620 A.2d 381, 388 (Md. Ct. Spec. App.) ("The implied duty of good faith does not change the terms of the contract."), *vacated on other grounds*, 631 A.2d 447 (Md. 1993); *Parker*, 604 A.2d at 531 ("[T]he duty of good faith . . . does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under its [contract].").

Imposing an implied duty on the defendants to extend the time deadlines because of the expansion in curtain wall work would contravene the express terms of the Settlement Agreement. The Settlement Agreement expressly contemplated that the defendants *could* supplement the curtain wall work, *without* providing an extension of time. (*See* J.A. at 346 ("JMB acknowledges and agrees that [the defendants] reserve the right to supplement the Deficiency List with regard to the structural deficiencies and revisions in the east wing of the Retail Pavilion building,[4] and . . . JMB will complete the work

---

[4]The Deficiency List indicates the curtain wall deficiencies were in the east wing of the retail pavilion.

as set forth in any such supplement(s) *without . . . delay*." (Emphasis added)).) The defendants bargained for the express power to supplement the curtain wall work without giving up their expectation that the project would be complete within time limits they found acceptable. Maryland law would not vitiate this bargained-for power by imposing upon the defendants an implied obligation to extend the time under these circumstances.

The exhibits JMB attached to its complaint reveal that JMB was not entitled to an extension of time. JMB accordingly was required to achieve Final Completion by November 16, which it admits it failed to do. The consequence of JMB's failure to achieve Final Completion by November 16 was that JMB would be "in default," and could be "terminated with no notice or opportunity to cure." (J.A. at 348.) The consequence of a default by JMB was that JMB would not be entitled to the escrowed funds, and that the escrowed funds would be returned to the defendants. (*See* J.A. at 361, 376.) Accordingly, the defendants were free to terminate the contract and take back the escrowed funds when JMB defaulted on November 16. It follows that the defendants could not have breached the contract by doing so.

JMB appears to interpret the Settlement Agreement as entitling it to receive the escrowed funds if it achieved "Substantial" Completion by November 16, even if it did not achieve "Final" Completion by November 16. This interpretation would eliminate the requirement that JMB achieve Final Completion. Since JMB would not be entitled to receive the escrowed funds "in the event of a default by JMB," (J.A. at 361, 376), JMB's interpretation necessarily assumes that failure to achieve Final Completion would not constitute a "default." This assumption is contrary to the terms of the Settlement Agreement, in which "JMB expressly acknowledge[d] that if it fails to achieve Final Completion within the aforesaid time period it shall be in default," (J.A. at 348), *i.e.* it would not be entitled to the escrowed funds.

We conclude that JMB "pled itself out of a claim" by attaching the several contract documents to its complaint. When we assume the truth of the facts alleged by JMB in its amended complaint, as supplemented by the facts contained in the attached exhibits, those facts permit of no other conclusion except that JMB was in default under the Settlement Agreement, and that the defendants were free to terminate

JMB and to take back the escrowed funds. Accordingly, the district court properly found that JMB failed to state a claim for breach of contract.

### D.

Next JMB argues that the district court erred in dismissing its declaratory judgment claim. By this claim, JMB seeks a declaration that, to the extent the Settlement Agreement provides that JMB forfeited the escrowed funds and its claims against JMB's designers and subcontractors, such forfeitures are unlawful penalties, contrary to the public policy of Maryland, and hence, unenforceable.

As part of the settlement of the parties' disputes, including settlement of the defendants' arbitration claims against JMB, JMB agreed to a vast release provision. In relevant part, it states:

> Except for claims that RCI or PPI have breached their payment obligations as set forth [herein] . . . JMB . . . does hereby release and forever discharge [the defendants] . . . from any and all claims, demands, debts, dues, damages, causes of actions, liabilities, losses, suits, fees (including attorney's fees), costs, accounts, bonds, bills, covenants, contracts, controversies, agreements, promises, variances, damages, judgments, executions, mechanics' or material-men's liens, claims and demands whatsoever, whether known or unknown, arising in law or equity, of whatever nature (whether in contract, quasi-contract, tort or otherwise), that JMB . . . [has], had, may have had or may have in the future by reason of any facts, known or unknown . . . which in any way relate to or arise from the Contract, as amended, the Property and/or the Project.

(J.A. at 363.)

In Maryland, releases are construed according to traditional contract principles. *See Bernstein v. Kapneck*, 430 A.2d 602, 606 (Md. 1981). A release evidencing a settlement, like the release in this case, "is a jural act of exhalted [sic] significance which without binding

durability would render the compromise of disputes superfluous, and accordingly unlikely." *Id.* The language of the above-quoted release plainly bars JMB from asserting "any and all" claims against the defendants that "in any way relate to or arise from" the Contract and Settlement Agreement, except for claims "that RCI or PPI have breached their payment obligations." Only JMB's breach of contract claim falls within the exception. Accordingly, enforcement of this release bars JMB's declaratory judgment claim against the defendants.

Even if the release did not bar JMB's declaratory judgment claim, the claim was not sufficiently stated. JMB's allegations indicate JMB never had an ownership interest in the escrowed funds, and thus, did not "forfeit" them. It was the *defendants*, not JMB, that initially placed the funds into escrow. As discussed *supra*, the escrow agent was entitled to return those funds to the defendants when JMB defaulted. Since JMB never had an ownership or possessory interest in those funds, it could not have "forfeited" them. *Cf. Diep v. Rivas*, 745 A.2d 1098, 1104 (Md. 2000) ("There can be no forfeiture without first having beneficial use or possession. One cannot forfeit what he never had." (quoting *Price v. Hitaffer*, 165 A. 470, 471 (Md. 1933)). In none of the cases cited by JMB was it said that one forfeited something in which he had no ownership or possessory interest. Consequently, there was no "forfeiture" provision in the Settlement Agreement that could be construed as a "penalty."

At bottom, it appears JMB is attempting to replead its *quantum meruit* and unjust enrichment claims—the dismissal of which JMB does not appeal—in the guise of a public policy claim. The Court of Appeals of Maryland recently reaffirmed its long-standing reluctance to strike down voluntarily agreed-upon contractual arrangements on public policy grounds. *See Dwayne Clay, M.D., P.C. v. Government Employees Ins. Co.*, 739 A.2d 5 (Md. 1999). Given this reluctance, the court held that Maryland courts would not nullify voluntary bargains on public policy grounds unless the plaintiff could show: (1) that the challenged provision is "patently offensive to the public good, . . . [such that] the common sense of the entire community would . . . pronounce it invalid," and (2) that the alleged public policy is "deducible . . . from constitutional or statutory provisions." *Id.* (citations and internal quotation marks omitted). JMB has not indicated how the

challenged provisions are "patently offensive to the public good." Nor has JMB pointed to any constitutional or statutory provisions from which the alleged public policy is deducible. Accordingly, JMB did not sufficiently allege that the challenged provisions can be rendered unenforceable on public policy grounds. Its declaratory judgment claim was properly dismissed.

## E.

JMB's final contention is that the district court erred in dismissing its conversion claim. We agree with the district court that this claim also is barred by the release.

Regardless, JMB failed to state a claim for conversion. "A 'conversion' is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 963 (Md. 1999) (quoting *Interstate Ins. Co. v. Logan*, 109 A.2d 904, 907 (Md. 1954)). Since the only conclusion reachable from JMB's allegations is that JMB had no ownership interest in or right to withdraw the escrowed funds, there could not have been any wrongful conversion of those funds.

## III.

Because JMB failed to state any claim upon which relief can be granted, the district court's judgment is

*AFFIRMED*.