620 A.2d 381

**Muriel Jennings WALLER, et al.**

v.

**MARYLAND NATIONAL BANK.**

**No. 549, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Feb. 24, 1993.

Revised and Refiled April 29, 1993.

198

200

Edwin A. McCabe (Karen C. Lyons, Joseph P. Davis, III, The McCabe Group, Cambridge, MA, Daniel F. Goldstein, and Brown, Goldstein & Levy, Baltimore, on the brief), for appellants.

James R. Eyler and Gregg L. Bernstein (Marian C. Hwang, Ann M. Sheridan, and Miles & Stockbridge, on the brief), Baltimore, for appellee.

Argued before CATHELL, MOTZ and HARRELL, JJ.

HARRELL, Judge.

On 30 April 1987, appellants, Earthtech, Inc. (Earthtech) and its president and chief executive officer, Muriel Jennings Waller (Waller), filed a six count complaint against Maryland National Bank (MNB), appellee, in the Circuit Court for Baltimore City. The action was removed to the United States District Court for the District of Maryland on MNB's petition. Ultimately the entire action was remanded to the Circuit Court for Baltimore City on 22 July 1988.

On 4 January 1989, appellants filed an amended complaint. Several of the counts were brought by both appellants, others were brought individually. For clarity of discussion, we simply list the counts and the party or parties who brought them:

Count I: Earthtech and Waller alleged breach of contract for violation by MNB of its duty of good faith and fair dealing;

Count II: Earthtech and Waller alleged "negligent breach of contract;"

Count III: Earthtech and Waller alleged conversion;

Count IV: Earthtech alleged breach of contract, claiming a breach of alleged forbearance and workout agreements;

Count V: Earthtech alleged intentional interference with contractual and business relations; and

Count VI: Waller alleged intentional infliction of emotional distress.

On 6 February 1989, MNB filed a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Md.Rule 2–322(b)(2), and a motion for summary judgment under Md.Rule 2–501. On 9 May 1989, the circuit court (Ward, J.) granted MNB's motion to dismiss the claim for punitive damages under Count I and dismissed Count VI in its entirety. All other motions were denied.

MNB filed a motion for summary judgment on 22 March 1991. The circuit court (Heller, J.) in a Memorandum Opinion and Order dated 25 July 1991 granted the following

relief: (1) MNB's motion for summary judgment was granted as to Counts I and II; (2) the motion was denied as to Counts IV and V; and (3) the motion was granted, in part, as to Count III.

On 16 January 1992, appellants filed a motion for reconsideration and MNB filed a second motion for summary judgment as to all remaining claims. On 21 February 1992, the circuit court (Hammerman, J.), after hearing argument on appellants' motion for reconsideration, denied the motion. The circuit court then heard arguments on MNB's second motion for summary judgment and delivered an oral opinion from the bench granting MNB's motion as to all of appellants' remaining claims. Appellants noted this appeal on 10 March 1992.

## *Facts*

Earthtech is a Maryland corporation with technical expertise in earth measurement systems. In the early 1980s, Earthtech sought to develop two pieces of sophisticated equipment. In order to achieve this goal, Earthtech required additional working capital. On 16 February 1983, Earthtech obtained a loan from MNB for $50,000 evidenced by a Revolving Note which provided for a continuing line of credit. This Revolving Note also stated that it was payable "on demand." This note was executed by Earthtech's officers: Waller, President; John Millhiser, Vice–President; and Jeffrey Bloom, Vice–President. Each officer also personally and unconditionally guaranteed payment of Earthtech's obligations to MNB.

On 20 May 1983, Earthtech obtained a second loan for $5000 from MNB. This loan was evidenced by an Installment Note and was payable in thirty-five equal monthly installments.

The parties' relationship appeared to run smoothly until late April 1984 when Earthtech requested an additional loan from MNB to cover its May payroll. MNB denied Earthtech's request. Subsequently, during the afternoon of 30

April 1984, Gary Tyrrell, an MNB officer, arrived at Earth-tech's offices and requested that Earthtech's officers execute indemnity deeds of trust (IDOTs) on their residences in favor of MNB. Earthtech's officers were surprised and reminded Tyrrell that MNB already possessed adequate security for its loans. The officers refused to sign the IDOTs and, after much discussion, Tyrrell agreed to return the next morning in order to give the officers additional time to consider MNB's request.

The following day, 1 May 1984, Tyrrell arrived at Earth-tech's offices by mid-morning and immediately presented Earthtech's officers with a letter demanding repayment of the outstanding balance on the Revolving Note. Earthtech was unable to meet this demand. As a consequence, on 9 May 1984, MNB advised Earthtech that it was also in default of the Installment Note because it included a cross default provision, which provided that a default by Earth-tech under any agreement with MNB could result in default under *all* agreements between Earthtech and MNB. MNB, therefore, was invoking its right under the agreement to accelerate and demand payment of the outstanding principal and accrued interest of the Installment Note.

In early May 1984, Waller learned that she required an emergency hysterectomy. She entered the hospital on 8 May and underwent surgery the following day. Waller resumed active involvement in Earthtech, on a part-time basis, on 5 June 1984 and began working full-time on 11 June 1984. Appellants claim that MNB agreed to forbear from taking any action against Earthtech for the period of Waller's recovery. MNB, in contrast, claims that the for-bearance agreement was contingent upon Earthtech's officers executing IDOTs on their residences in favor of MNB.

On 7 June 1984, MNB filed confessed judgment actions against Earthtech and its officers. Subsequently, Earth-tech and MNB entered into a Workout Agreement. Under the Workout Agreement, Earthtech agreed to repay the full balance of the outstanding loans by mid-October 1984. In return, MNB agreed to dismiss the confessed judgment

actions. For some reason, not clear from the record extract, the Workout Agreement was never signed by both parties, but they operated as if the agreement had full effect.

Earthtech voluntarily accelerated the repayment period and MNB was repaid in full by 21 August 1984. Approximately three weeks later, on 13 September 1984, MNB dismissed the confessed judgment actions. MNB, however, had actually been overpaid by $582.31. The overpayment was remitted to Earthtech on 12 September 1984. In addition, MNB did not release a $433.57 balance in Earthtech's corporate account until 26 September 1984.

We will include additional facts as necessary in our discussion of the issues presented.

## *Issues*

Appellants present five issues and sub-issues, which we have slightly recast as follows:

I. Whether the circuit court erred in concluding that MNB was exempt from the common law duties of good faith and fair dealing in its contractual relations with appellants;

A. Whether MNB was required to exercise good faith in its performance and enforcement of the Revolving Note;

B. Whether the trial court erred in considering the Official Comment to § 1–208 of the Commercial Law Article in its decision to grant MNB's motion for summary judgment;

C. Whether Maryland's common law required MNB to exercise its discretionary right to call the Revolving Note in a commercially reasonable manner;

D. Whether the circuit court erred in refusing to consider evidence on the terms of the Revolving Note;

E. Whether there was a genuine dispute of a material fact as to whether the bank had a good faith basis for demanding immediate repayment of the Installment Note;

II. Whether the circuit court erred in granting MNB's motion for summary judgment as to appellants' claim for negligent breach of contract;

III. Whether the circuit court erred in finding no genuine dispute of a material fact as to the existence and breach of the alleged oral forbearance agreement;

IV. Whether the circuit court erred in finding no genuine dispute of a material fact as to whether MNB breached the Workout Agreement; and

V. Whether the circuit court erred in holding that appellant Waller failed to state a claim for intentional infliction of emotional distress.

### Entry of the Final Judgment

In the case *sub judice,* following the hearing on MNB's final motion for summary judgment on 21 February 1992, the circuit court delivered an oral opinion from the bench granting MNB's motion as to the remaining claims. At no time did the judge either direct the parties to submit a written order or inform the courtroom clerk that he would later submit such an order. Yet, the docket entry for 21 February 1992 states:

Defendant's Second Motion for Summary Judgment heard & "Granted" as to remaining Counts III, IV, and V. Order to be filed.

The record extract contains no Order granting MNB's Second Motion for Summary Judgment. We, therefore, must face the initial question of whether this appeal was properly taken.

■ Ordinarily, an appeal will lie only from a final judgment. An oral opinion is not a final judgment and not subject to appeal when the court directs that a written order be submitted. *Kearns v. Kearns,* 78 Md.App. 461, 465, 553 A.2d 1291 (1989). In *Rohrbeck v. Rohrbeck,* 318 Md. 28, 566 A.2d 767 (1989), the Court of Appeals set forth the three attributes a ruling must possess if it is to constitute a final judgment:

■ it must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court acts properly pursuant to Md.Rule 2–602(b), it must adjudicate or complete the adjudication of all claims against the parties, and (3) the clerk must make proper record of it in accordance with Md.Rule 2–601.

*Id.* at 41, 566 A.2d 767.

■ The duties of the clerk of the court in recording the court's ruling are outlined in Md.Rule 2–601, which provides, in pertinent part:

**Rule 2–601. ENTRY OF JUDGMENT**

(a) **When entered.**—Upon ... a decision by the court ... denying all relief, the clerk *shall* forthwith enter the judgment, *unless the court orders otherwise.* (Emphasis supplied).

The entry of the judgment on the docket is a ministerial function and the clerk possesses no discretion in this matter. *Corey v. Carback,* 201 Md. 389, 402, 94 A.2d 629 (1953); *Director of Fin. of Baltimore City v. Harris,* 90 Md.App. 506, 513, 602 A.2d 191 (1992). *See also* 15A Am.Jur.2d Clerks of Court § 21 (1976); 46 Am.Jur.2d Judgments §§ 154, 156 (1969).

■ We believe the ruling by the circuit court on MNB's second motion for summary judgment has all the attributes of a final judgment. A careful examination of the circuit court's oral ruling from the bench reveals that the court intended the ruling to be a final disposition of the matter in controversy. In addition, the circuit court's ruling completed the adjudication of all the claims between the parties. MNB's motion for summary judgment was granted as to all of the remaining claims; therefore, appellants had no further claims to present in the circuit court. Finally, the clerk made a record of the ruling by writing on the docket, "Defendant's Second Motion for Summary Judgment heard & "Granted" as to remaining Counts III, IV, and V." We believe the clerk's final notation, "Order to be filed[,]" was a unilateral act by the clerk without any direction from the

circuit court. We will not allow such an entry, written in error by the clerk of the court, to defeat the finality of the judgment entered. *See Harris,* 90 Md.App. at 512–15, 602 A.2d 191. Consequently, the circuit court's ruling on 21 February 1992, which was recorded on the docket on that date, constitutes a final judgment from which this appeal may be taken; the clerk's addition "Order to be filed" was unauthorized and unnecessary surplusage. *See Rohrbeck,* 318 Md. at 41–46, 566 A.2d 767.

## Standard of Review

A trial court may grant a motion for summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Md.Rule 2–501(e). This procedure "is not a substitute for a trial, but a means by which the trial court may determine, summarily, whether a trial is necessary." *Wash. Homes, Inc. v. Interstate Land Dev. Co.,* 281 Md. 712, 716, 382 A.2d 555 (1978). In reviewing a disposition by summary judgment, we must decide whether a material factual issue exists, and in doing so, will resolve all factual inferences against the moving party. *King v. Bankerd,* 303 Md. 98, 110–12, 492 A.2d 608 (1985); *Syme v. Marks Rentals, Inc.,* 70 Md.App. 235, 237–39, 520 A.2d 1110 (1987). A material fact is one which will affect the outcome of the case in some way; therefore, "a dispute over a non-material fact will not preclude summary judgment." *Bankerd,* 303 Md. at 111, 492 A.2d 608. In addition, the party opposing the motion for summary judgment "must proffer material facts which would be admissible in evidence." *Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 243, 603 A.2d 1357 (1992). When the moving party has set forth sufficient grounds for summary judgment, the opposing party must demonstrate, in some degree of detail, that there is a dispute as to a material fact. *Bankerd,* 303 Md. at 112, 492 A.2d 608. General denials and allegations are insufficient to defeat a motion for summary judgment. *Id.* Finally, if there are no material factual disputes, then

we must decide whether the trial court was legally correct because the trial court decides issues of law, not fact, when granting summary judgment. *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591–92, 578 A.2d 1202 (1990).

The standard of review which we apply to appellant Waller's Issue V is separately set forth in our discussion, *infra,* at 234.

## Discussion

### I.

Earthtech and Waller argue that the circuit court erred in concluding that MNB was exempt from the common law duty of good faith and fair dealing in its contractual relations with them. Appellants present five arguments attacking the circuit court's ruling that appellee was exempt from this duty. We will address each argument separately, as appellants have done in their brief.

### A.

Appellants first argue that the circuit court erred because it failed to consider that MNB, as a party to a contract, was subject to a good faith duty not only in the *enforcement* of the Revolving Note, but also in its *performance.* Appellants claim that MNB breached its duty of good faith in the performance of the contract by engaging in "collection activities" prior to MNB explicitly demanding payment of the Revolving Note. Appellants point to several examples of these alleged collection activities, including: (1) MNB sought the IDOTs as additional collateral at a time when MNB had already decided it would demand repayment of the Revolving Note the very next day; (2) MNB froze Earthtech's checking account one day before demanding payment; (3) MNB advised Earthtech's independent payroll service not to process the payroll one day before demanding payment; (4) an MNB officer acted in bad faith by withholding certain information from and misrepresenting other

information to his superior; and (5) MNB acted to hinder Earthtech and Waller in their performance of their obligations under the Revolving Note. In summary, appellants claim that by engaging in collection activities prior to demanding repayment and by withholding material facts, MNB interfered with Earthtech's ability to repay the Revolving Note and, therefore, failed to perform its obligations under the Revolving Note in good faith. We disagree with appellants contentions and explain.

Initially, we observe that the circuit court clearly addressed whether MNB must be held to a good faith standard in the performance as well as the execution of the Revolving Note. In its Memorandum Opinion and Order of 25 July 1991, the circuit court engaged in a lengthy discussion of the law applicable to demand notes, both in this State and in other jurisdictions. The circuit court discussed the impact of the good faith standard upon the terms of an express contract, finding that this implied duty cannot vary the standard established by an express contract. Therefore, we believe that the circuit court adequately addressed appellants' contentions. Next, we consider whether the circuit court was correct in its legal analysis and ultimate conclusion.

■ Maryland law implies a duty of good faith and fair dealing in certain contracts. *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166 (1964); *Parker v. Columbia Bank*, 91 Md.App. 346, 366, 604 A.2d 521, *cert. denied*, 327 Md. 524, 610 A.2d 796 (1992); *E. Savs. Bank, F.S.B. v. Nardo*, 85 Md.App. 702, 712, 584 A.2d 1301 (1991); *P.V. Properties, Inc. v. Rock Creek Village Assocs. Ltd. Partnership*, 77 Md.App. 77, 86, 549 A.2d 403 (1988). In *Columbia Bank, supra,* Judge Motz, writing for this Court, outlined the boundaries of this implied duty of good faith and fair dealing, stating:

> [T]his duty simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.... Thus, the duty of good faith merely obligates a lender to

exercise good faith in performing its contractual obligations; it does not obligate a lender to take affirmative actions that the lender is clearly not required to take under its loan documents.

*Id.* 91 Md.App. at 366, 604 A.2d 521 (citations omitted). The implied duty of good faith does not change the terms of the contract. In addition, when the language of a contract is plain and unambiguous, there is no room for construction by the court. "[T]he clear and unambiguous language of an agreement will not give way to what the parties thought that the agreement meant or intended it to mean." *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985). The actual contract, therefore, is the starting point for our analysis.

In the case *sub judice*, appellants and MNB entered into a loan agreement on 2 February 1983 that was evidenced by the Revolving Note. The clear and unambiguous language of the Revolving Note provides, in pertinent part:

> *ON demand,* the Undersigned (whether one or more than one) promises (jointly and severally, if more than one) to pay to the order of MARYLAND NATIONAL BANK (the "Bank") the principal sum of Fifty thousand and 00/100 Dollars (the "Principal Sum") or so much thereof as shall have been actually advanced by the Bank to the Undersigned.... (Emphasis supplied).

The Revolving Note is clearly a demand note or loan. Section 3–108 of the Commercial Law Article states, in part, that a demand note is one "in which no time for payment is stated." A demand note "expressly states that it is payable on demand, on presentation or at sight." Black's Law Dictionary 224 (5th ed. 1983). A demand loan "may be called by lender at any time because there is no fixed maturity date." *Id.* In addition, the circuit court had before it the deposition testimony of Waller and Earthtech's Vice–President Bloom, which indicated that they understood the terms and potential harshness of the Revolving Note.

■ The Court of Appeals has interpreted demand notes as payable immediately, without demand. *Billingsley v. Kelly*, 261 Md. 116, 128, 274 A.2d 113 (1971); *Continental Oil Co. v. Horsey*, 177 Md. 383, 385, 9 A.2d 607 (1939); *Blick v. Cockins*, 131 Md. 625, 630, 102 A. 1022 (1917). In addition, the Revolving Note executed by the parties states, in part:

> Each obligor [Earthtech and Waller] ... hereby *waives demand,* presentment for payment, protest, notice of dishonor and of protest.... (Emphasis supplied).

Appellants waived any requirement that MNB demand repayment prior to engaging in collection activities. *See Billingsley*, 261 Md. at 127–28, 274 A.2d 113. Notwithstanding this waiver, appellants now seek to impose an obligation upon MNB that it did not assume under the Revolving Note. This Court, under the guise of an implied duty of good faith, will not impose such an affirmative obligation upon MNB. The implied duty of good faith may not be used to extend or add to the obligations a party has accepted under a contract. *See Columbia Bank*, 91 Md. App. at 366, 604 A.2d 521. MNB had no contractual obligation to demand payment from appellants before engaging in collection activities. Thus, the circuit court did not err in granting MNB's motion for summary judgment as to Count I.

Appellants place great reliance upon a bankruptcy case, *In re Martin Specialty Vehicles, Inc. v. Bank of Boston–W. Mass., N.A.*, 87 B.R. 752 (Bankr.D.Mass.1988), *rev'd*, 97 B.R. 721 (D.Mass 1989), in which, they claim, a bank's foreclosure on a debtor's demand note before demanding repayment was found to be actionable bad faith. While we hesitate to discuss this case because it was ultimately reversed on jurisdictional grounds, we do so because of its apparent importance to appellants' position. We disagree with appellants' reading of this case because the bankruptcy court found that the notes in question were "not true demand instruments." *Id.* at 765. In contrast, the Revolving Note at issue in the present case is a true demand

instrument; therefore, appellants reliance on this case is misplaced.[1]

B.

Appellants next attack the circuit court's references to the Official Comment of Md.Com.Law I Code Ann. § 1–208 (1992). Appellants claim that the circuit court based its grant of summary judgment as to Count I on the Comment.[2] They argue that a comment to the section in question cannot be used to preempt the common law of this State. Appellants then go on to argue that the implied duty of good faith and fair dealing was breached by MNB in the performance and enforcement of the Revolving Note. We address only appellants' claim attacking the circuit court's reliance on the Comment to the Commercial Law Article. Appellants' argument relating to the good faith performance of the note was discussed in Issue I.A., *supra*, and the argument relating to the good faith enforcement of the note is discussed in Issue I.C., *infra*.

 Earthtech and Waller are correct in that "Maryland courts adhere to the policy that statutes are not to be construed to alter the common-law by implication." *Hardy v. State*, 301 Md. 124, 131, 482 A.2d 474 (1984). They also refer this Court to § 1–103 of the Commercial Law Article which provides, in pertinent part:

---

1. MNB also refers to numerous out of state cases. *See* Appellee's brief at 12 n. 7. None of them squarely holds that a holder of a demand note has a good faith duty to the borrower in "collection activities" like the duty asserted by appellants here. Accordingly, we do not believe it is necessary to refer to each of those cases in our discussion of this issue. We believe, instead, that Maryland case law on the implied duty of good faith and fair dealing and contract law adequately address the question presented.

2. At this time we must recognize that appellants often speak of the circuit court's disposition of Counts I–V as a "dismissal." The circuit court, however, explicitly stated that it was granting "summary judgment." We, therefore, treat these counts as on review from a grant of summary judgment.

Unless displaced by the particular provisions of Titles 1 through 10 of this article, the principles of law and equity ... shall supplement its provisions....

These arguments, however, are of little help to appellants because they misconstrue the circuit court's reliance on the Official Comment.

Section 1–208 and its official comment provide, in part:

**§ 1–208. Option to accelerate at will.**

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired.

### OFFICIAL COMMENT

\* \* \* \* \* \*

Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason. This section applies only to an agreement or to paper which in the first instance is payable at a future date.

An official comment cannot be used to alter the plain language of a statute, but it may be used as an aid in determining the legislature's intent. *Jefferson v. Jones,* 286 Md. 544, 548, 408 A.2d 1036 (1979). In addition, the Court of Appeals and this Court have often used the official comments as an aid in interpreting the Commercial Law Article. *See, e.g., Mercantile–Safe Deposit & Trust Co. v. Baltimore County,* 309 Md. 668, 674, 526 A.2d 591 (1987); *Weast v. Arnold,* 299 Md. 540, 550–51, 474 A.2d 904 (1984); *Rezapolvi v. First Nat'l Bank of Md.,* 296 Md. 1, 14, 459 A.2d 183 (1983); *Fico, Inc. v. Ghingher,* 287 Md. 150, 152 n. 1, 154 n. 3, 157 & n. 4, 158 & n. 5, 411 A.2d 430 (1980); *John J. Kirlin, Inc. v. Gaco Sys., Inc.,* 80 Md.App. 506, 512–13,

565 A.2d 114 (1989), *cert. denied,* 318 Md. 310, 568 A.2d 21 (1990).

Based on our review of the circuit court's Memorandum Opinion and Order we believe the court used the Official Comment in the manner in which it was intended to be used. The Official Comment was merely given consideration in helping the court understand the nature of a demand note. Appellants' implication that the Official Comment was the circuit court's sole basis for not imposing an implied duty of good faith and fair dealing is clearly without merit. The circuit court carefully discussed the law in this State and in other jurisdictions and its references to the Official Comment to § 1–208 were but a small part of its discussion of its decision to grant summary judgment as to Count I. We do not believe that the circuit court committed any error by considering the Official Comment in reaching its decision.

### C.

Appellants further argue that Maryland's common law required MNB to exercise its discretionary right to call the Revolving Note in a commercially reasonable manner. They contend that "if the demand note does not spell out any standard for calling the loan, then the implied covenant of good faith and fair dealing should imply a reasonableness standard." Appellants, therefore, claim that the circuit court erred in granting summary judgment as to Count I because MNB breached the implied duty of good faith and fair dealing in its *enforcement* of the Revolving Note. We disagree with appellants' contentions and explain.

As discussed in Issue I.A., *supra,* the Revolving Note was clearly a demand note. As a demand note it was payable immediately, without demand. *Billingsley v. Kelly,* 261 Md. 116, 128, 274 A.2d 113 (1972); *Continental Oil Co. v. Horsey,* 177 Md. 383, 385, 9 A.2d 607 (1939); *Blick v. Cockins,* 131 Md. 625, 630, 102 A. 1022 (1917). A demand loan may be called at any time by the lender because there is no fixed date of maturity. Black's Law Dictionary 224

(5th ed. 1983). Although § 1–208 of the Commercial Law Article imposes a general requirement of good faith in an option to accelerate at will, the Official Comment states, "Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason."

In addition, the weight of authority in other jurisdictions holds that the good faith requirement does not apply to a lender's decision to call a demand note. *See, e.g., Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357–58 (7th Cir.1990); *Taggart & Taggart Seed, Inc. v. First Tenn. Bank Nat'l Ass'n,* 684 F.Supp. 230, 235–36 (E.D.Ark.1988), *aff'd,* 881 F.2d 1080 (8th Cir.1989); *Dominion Bank, N.A. v. Moore,* 688 F.Supp. 1084, 1086–87 (W.D.Va.1988); *Spencer Cos. v. Chase Manhattan Bank, N.A.,* 81 B.R. 194, 199 (D.Mass 1987); *Pavco Indus., Inc. v. First Nat'l Bank of Mobile,* 534 So.2d 572, 576–77 (Ala. 1988); *Flagship Nat'l Bank v. Gray Distribution Sys., Inc.,* 485 So.2d 1336, 1340 (Fla.Dist.Ct.App.1986), *review denied,* 497 So.2d 1217 (Fla.1986); *Fulton Nat'l Bank v. Willis Denney Ford, Inc.,* 154 Ga.App. 846, 269 S.E.2d 916, 918–19 (1980); *Centerre Bank of Kansas City, N.A. v. Distribs., Inc.,* 705 S.W.2d 42, 46–48 (Mo.App.1985); *Simon v. N.H. Savs. Bank,* 112 N.H. 372, 296 A.2d 913, 915 (1972); *Allied Sheet Metal Fabricators, Inc. v. Peoples Nat'l Bank of Washington,* 10 Wash.App. 530, 518 P.2d 734, 738, *cert. denied,* 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974). *But see K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 760 (6th Cir.1985).

Appellants refer us to a Court of Appeals decision, *Julian v. Christopher,* 320 Md. 1, 575 A.2d 735 (1990), for the proposition that a discretionary contractual right must be exercised in good faith and in accordance with fair dealing. *Id.* at 9, 575 A.2d 735. In *Julian,* a lease contained a "silent consent" clause which prohibited assignment or subletting of the premises without the prior written consent of the landlord. The Court of Appeals, in reversing an earlier decision, *Jacobs v. Klawans,* 225 Md. 147, 169 A.2d 677

(1961), addressed the effect of the implied duty of good faith and fair dealing upon the lease agreement, stating:

[T]his Court has recognized that in a lease, as well as in other contracts, "there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others." *Food Fair v. Blumberg*, 234 Md. 521, 534 [200 A.2d 166] (1964). When the lease gives the landlord the right to exercise discretion, the discretion should be exercised in good faith, and in accordance with fair dealing; *if the lease does not spell out any standard for withholding consent, then the implied covenant of good faith and fair dealing should imply a reasonableness standard.*

*Id.* (emphasis supplied).

Appellants' reliance on this case is misplaced for two reasons. First, the Court of Appeals based its decision in *Julian* partly on the public policy against restraints on alienation and not on factors relevant to commercial law. Second, and most damaging to appellants' position, the Revolving Note in question clearly spells out the standard to be applied in enforcing the note, i.e., it is payable on demand.

Appellants next direct our attention to *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 515 A.2d 756 (1986). They point out that banks have traditionally "been held to a high degree of integrity and responsiveness to their public calling." *Id.* at 542, 515 A.2d 756. Appellants contend that "public policy requires that when a bank calls a loan it should do so reasonably." They argue that allowing MNB arbitrarily to demand payment would, in essence, nullify the borrower's access to the loan proceeds. Again, we must respond that this Court will not imply a reasonableness term that cannot be found in the Revolving Note.

In summary, the Revolving Note was clearly a demand note, as evidenced by its clear and unambiguous language. A demand note by its very nature may be called at any time by the holder, with or without reason. Therefore, the

circuit court did not err in holding that MNB was not required to act in good faith and thereby impose a reasonableness standard upon MNB's conduct. Instead, MNB could enforce the plain terms of the contract and call the demand note at anytime, with or without reason. The circuit court's grant of summary judgment as to Count I was proper.

## D.

Next, appellants argue that the circuit court improperly refused to consider evidence regarding the terms of the Revolving Note when it held that the evidence set forth by appellants violated the parol evidence rule. Appellants claim that the parties orally modified the Revolving Note into a term note and thereby subjected MNB to an implied duty of good faith. In addition, appellants contend that they presented evidence of an oral modification that would not violate the parol evidence rule. Finally, appellants argue that the "on demand" provision of the Revolving Note directly contradicted the security agreement, which listed an event of default as "the determination in *good faith* by the Bank [MNB] that the prospect of payment of any of the Obligations is impaired for any reason." (Emphasis supplied).

The clear and unambiguous language of the Revolving Note stated that it was payable "on demand." There is no room for construction of a contract by a court when its language is plain and unambiguous. *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306 (1985). Therefore, the circuit court was correct in holding as a matter of law that the loan agreement, at the time it was signed, was in fact a demand note.

The circuit court then refused to consider what it believed was parol evidence to vary the terms of the Revolving Note. It is a basic principle of the common law that absent fraud, duress or mistake, "parol evidence is inadmissible to vary or contradict the terms of a written instru-

ment." *Freeman v. Stanbern Constr. Co.*, 205 Md. 71, 77, 106 A.2d 50 (1954). Therefore, all prior and contemporaneous negotiations and conversations are merged in the written instrument. *Id.*

We agree with appellants that the circuit court erroneously excluded Waller's affidavits as parol evidence. In her affidavits, Waller stated that many of the conversations in question took place *after* the Revolving Note was signed. We believe, however, that the error committed by the circuit court was harmless. This Court will not reverse a lower court for harmless error. *See Beahm v. Shortall,* 279 Md. 321, 330–31, 368 A.2d 1005 (1977); *I.W. Berman Properties v. Porter Bros., Inc.*, 276 Md. 1, 11–12, 344 A.2d 65 (1975).

To explain our position, we quote liberally from Waller's affidavits and deposition testimony, none of which violated the parol evidence rule:

In her 19 April 1991 affidavit, Waller stated, in part: Although the Revolving Note states that it was payable on demand, I had several conversations with Ann Canty, an officer of the Bank [MNB], *after* the loan was made in which she advised me that the loan was in fact payable in one year. In accordance with that oral agreement, Earthtech repaid the loan in its entirety in late 1983, *and later drew down against the credit line once more.* (Emphasis supplied).

Waller's 15 July 1991 affidavit provides, in part:

Ms. Canty advised me that the note would effectively be a term note; that is, for 60 days out of every 365 days, Earthtech must repay the Bank and not owe it any amount.... Ms. Canty reiterated that position after the loan was made.

In her 14 January 1992 affidavit, Waller stated, at paragraphs six and seven:

6. After Earthtech opened the line of credit with the Bank, I had conversations with Ms. Canty in which we agreed that the loan would be repayable in one year.

7. If Earthtech was "out of the Bank" for 60 days during the next 360 calendar days, the loan would be automatically renewed.

In her deposition, taken on 5 November 1990, Waller testified as follows:

A. ... we paid off the loan in full at least once and probably several times in that time frame.

Q. ... Do you remember when Earthtech paid off the loan in full?

A. We were out of the bank for 120 days.

Q. When was that?

A. In the first year, between 2–16–83 and the end of the year, the end of the calendar year 1983.

\* \* \* \* \* \*

Q. So it's your recollection that Ms. Lyon had asked Earthtech to, as you call it, be out of the account for a minimum of 60 days?

A. For 360, not necessarily 60 consecutive days.

Even if we proceed by accepting the truth of Waller's statements, we still do not believe, as a matter of law, that the parties orally modified the Revolving Note into a term loan. This is so because the *only* reasonable inference that can be drawn from Waller's statements is that the Revolving Note remained a demand note. We do not believe MNB's requirement that the loan balance be reduced to zero for a certain number of days per year alters the demand feature of the Revolving Note.

A term loan is "[a] loan with a maturity date, as opposed to a demand loan which is due whenever the lender requests payment." Black's Law Dictionary 766 (5th ed. 1983). In addition, § 3–109 of the Commercial Law Article provides, in pertinent part:

**§ 3–109. Definite Time.**

(1) An instrument is payable at a definite time if by its terms it is payable:

(a) On or before a stated date or at a fixed period before a stated date; or

(b) At a fixed period after sight; or

(c) At a definite time subject to any acceleration....

In contrast, § 3–108 of the Commercial Law Article provides:

**§ 3–108. Payable on demand.**

Instruments payable on demand include those payable at sight or on presentation and those in which *no time for payment is stated.* (Emphasis supplied).

Appellants merely claim that MNB required that there be no outstanding balance on the Revolving Note for at least sixty days per year. Appellants are unable to refer this Court to a fixed maturity date.

In order for Earthtech to obtain funds from MNB, Waller would contact MNB with a request for a certain sum. MNB would transfer the money into Earthtech's account; this transfer would subsequently appear on Earthtech's account statement. Even after the balance was reduced to zero, the principal sum, $50,000, was still available to be drawn on by Earthtech at a future date. If we examine the Revolving Note, it provides, in part:

The fact that the balance hereunder may be reduced to zero from time to time pursuant to the Loan Documents (as hereinafter defined) will not affect the continuing validity of this note, or the Loan Documents, and the balance may be increased to the principal sum after any such reduction to zero.

Under the terms of the Revolving Note, the fact that Earthtech reduced the balance to zero would not affect the validity of the note or the Loan Documents. This necessarily includes the demand feature of the note. In addition, if the Revolving Note was payable in one year, we have no evidence of a new note being executed by the parties. Finally, appellants are unable to establish a specific date on which MNB required the note to be completely repaid; there is clearly no fixed maturity date. Appellants, therefore, cannot establish, as a matter of law, that the Revolving Note was transmuted into a term note to which the

implied duty of good faith was applicable. Although the circuit court erred in refusing to admit Waller's testimony, as discussed above, that error was harmless.

■ We address appellants' final contention under this sub-issue: that the "on demand" language of the note directly contradicted the terms of the security agreement, which, appellants argue, required MNB to determine in good faith that the prospect of repayment was impaired. We believe this argument is also without merit. Paragraph 19 of the security agreement provides, in pertinent part:

19. *Default.* The occurrence of any one or more of the following events shall constitute a default under this Security Agreement: (a) failure of the Obligor to pay any of the Obligations as and when due and payable ... (c) the occurrence of a default under any of the Loan Documents....

Paragraph 19 goes on to list several *alternative* events of default. Because they are listed in the alternative, the occurrence of any one of them constitutes an event of default. *See* 17A C.J.S. Contracts § 304 (1963). Therefore, when appellants did not meet MNB's demand for repayment of the Revolving Note (a Loan Document), they were in default pursuant to paragraph 19 of the Security Agreement. It is irrelevant that another event of default may require good faith when appellants were in default under paragraph 19(a) and/or (c).

■ Furthermore, because the two instruments represent the agreement between the parties, they must be construed together. *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 415, 559 A.2d 365 (1989); *Rothman v. Silver,* 245 Md. 292, 296, 226 A.2d 308 (1967). A proper interpretation of the two instruments seeks to give effect to all of their provisions. *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 167, 198 A.2d 277 (1964); *Rothman,* 245 Md. at 296, 226 A.2d 308. The security agreement was intended to secure the "prompt repayment of *all* indebtedness, liabilities and obligations of the Obligor to the Bank *of any nature whatsoever....*" (Emphasis supplied). This agree-

ment secured every loan made by MNB to Earthtech. Paragraph 19 simply covers a broad spectrum of possible defaults by a borrower which may vary depending upon the type of loan agreement between the parties. We do not believe the alternative default provisions listed in paragraph 19 of the security agreement, a form agreement, alters the demand provision, a typewritten term, of the Revolving Note. *See* Md.Com.Law I Code Ann. § 3–118(b) (1992).

## E.

Appellants next claim that the circuit court erred in granting summary judgment with respect to their claim that MNB breached the terms of the Installment Note. Earthtech and Waller claim that the circuit court's enforcement of the "cross-default provision" in the Installment Note allowed MNB to nullify its explicit contractual undertaking to act in good faith under that note, effectively, transforming the Installment Note into a demand note. Appellants refer this Court to two clauses in the Installment Note that require MNB to make a good faith determination that either an adverse change had occurred or that its prospects of repayment were impaired. Appellants, therefore, argue that a genuine dispute exists as to whether MNB had a good faith basis for demanding immediate repayment of the Installment Note.

We begin by examining the Installment Note, which provides, in pertinent part:

The occurrence of any one or more of the following events shall constitute a default under this Note: ... (c) the failure of any Obligor to perform or comply with any of the provisions hereof and/or of the Loan Documents; (d) the occurrence of a default under any of the Loan Documents; ... (i) the determination in good faith by the Bank that a material adverse change has occurred in the financial condition of any Obligor from the condition set forth in the most recent financial statement of such Obligor heretofore furnished to the Bank, or from the financial condition of such Obligor as heretofore most

recently disclosed to the Bank in any other manner; or (j) the determination in good faith by the Bank that the prospect of payment of this Note is impaired for any reason....

The Installment Note defines "Loan Documents" as:

The obligations of the Undersigned evidenced by this Note are secured by, guaranteed by, and are part of the obligations referred to in, any security agreement, guaranty agreement, mortgage, deed of trust, pledge agreement, loan agreement, hypothecation agreement, indemnity agreement, letter of credit application, assignment or any other document previously, simultaneously or hereafter executed and delivered by any of the Undersigned or by any other party (collectively, the "Loan Documents") as security for, as guaranty of, or in connection with, obligations of any of the Undersigned to the Bank ... whether or not this Note is specifically referred to therein.

The events of default are listed in the alternative; therefore, default could result from the occurrence of any *one* of the listed events. Consequently, when appellants failed to pay the Revolving Note—a Loan Document—they were also in default under the Installment Note. MNB was not required in such an instance to make a good faith determination that an adverse change had occurred or that it believed its prospect for repayment was impaired. It could immediately demand repayment.

Appellants' argument that this Court should not permit MNB to nullify an express contractual undertaking by MNB to act in good faith and, in effect, turn the Installment Note into a demand note is also without merit. As discussed above, that good faith undertaking became inapplicable when the alternative event of default occurred. In addition, these were two commercial entities dealing at arms length and the clear and unambiguous language of the Installment Note provides for such a calling of the Note. Therefore, the cross-default provision provided sufficient justification for MNB to demand repayment of the

Installment Note when Earthtech defaulted on the Revolving Note. *Mercantile–Safe Deposit & Trust Co. v. Delp & Chapel Concrete & Constr. Co.*, 44 Md.App. 34, 43, 408 A.2d 1043 (1979), *cert. denied*, 287 Md. 751 (1980). *See also Santini v. Fritkin*, 240 Md. 542, 544–45, 214 A.2d 578 (1965); *Genn v. CIT Corp.*, 40 Md.App. 516, 519, 392 A.2d 1135 (1978). The circuit court did not err in granting MNB's motion for summary judgment as to appellants' claim for breach of the Installment Note.

## II.

Appellants next claim that the circuit court erred in granting MNB's motion for summary judgment as to Count II of appellants' amended complaint, "negligent breach of contract." Appellants argue that implicit in MNB's undertaking to lend money to Earthtech was the agreement to do so with reasonable care and in good faith. They refer this Court to numerous alleged examples of MNB's breach of the duty of care, including: MNB's failure to perfect its security interest, thus not only endangering MNB's own collateral, but also increasing the risk to Earthtech's officers who personally guaranteed the loan; requesting the indemnity deeds of trust even though no default had occurred and while MNB possessed adequate security; breach of a forbearance agreement; wrongfully instructing an auctioneer to withhold auction proceeds; wrongfully obtaining a lien release on Waller's residence and then failing promptly to record it after the loan that it secured had been repaid in full; and wrongfully withholding Waller's retirement fund.

Appellants claim that MNB's actions deprived them of the benefits of the loan agreement and prevented them from meeting their business and financial obligations. Appellants also claim that they are entitled to punitive damages.

Although not properly characterized as "negligent breach of contract," appellants are correct that Maryland recognizes that the duties arising from a contract may

be enforced by a negligence action as well as a contract action. *See Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 515 A.2d 756 (1986). To state a claim of negligence, appellants must prove the existence of four elements: (1) a duty owed to them by MNB; (2) a breach of that duty by MNB; (3) a legally cognizable relationship between the breach of that duty and the resultant harm; and (4) damages. *Id.* at 531, 515 A.2d 756.

Appellants contend that the duty owed to them arose out of the Revolving Note and Installment Note. When the alleged breach of a contract duty results solely in economic harm, tort liability may also be imposed. *Id.* at 534–35, 515 A.2d 756. Liability for negligence, however, must still be based on a *duty* and the only basis for that duty in these circumstances is the duty owed under the contract documents. *Id.* at 531, 515 A.2d 756.

In the case *sub judice*, appellants simply allege that a duty of reasonable care was breached by MNB, i.e., that MNB negligently breached the loan agreements. They do not, however, refer this Court to any breach of a contract term. Indeed, all of the alleged breaches of duty listed above are *not* breaches of a contract term. Appellants merely argue from this alleged "duty" and then state factors that they believe demonstrate its breach. They must first point to the basis of MNB's duty. The basis of the "duty" is still the contract itself, and without a breach of an actual duty imposed by the contact, there can be no negligent breach of that duty. At no point in the loan agreement did MNB contract to perform the actions that appellants complain of; therefore, appellants' claim that MNB negligently breached a duty owed to them is clearly without merit.

In addition, it is well established that "the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between debtor and creditor and is not fiduciary in nature." *Yousef v. Trustbank Savs., F.S.B.*, 81 Md.App. 527, 536, 568 A.2d 1134

(1990) (citations omitted). *See also Parker v. Columbia Bank*, 91 Md.App. 346, 368, 604 A.2d 521 (1992). "Courts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement." *Parker*, 91 Md.App. at 369, 604 A.2d 521. We do not believe that this case presents us with the special circumstances necessary to extend MNB's duties beyond those contained in the loan agreements. The parties in the present case are business entities dealing at arms length, and there was no special trust placed in MNB by appellants. In addition, a party cannot completely abandon the responsibility for its own protection and rely upon the benevolence of the other contracting party. *Id.* at 369–70, 604 A.2d 521.

Appellants also refer this Court to the implied duty of good faith and fair dealing and MNB's alleged breach of this duty to support their claim for "negligent breach of contract." As we discussed in Issue I, *supra*, either that duty was not breached or it was inapplicable to the loan agreements in question. The circuit court, therefore, did not err in granting MNB's motion for summary judgment as to appellants' claim for "negligent breach of contract." Finally, because of our holding on this issue, we need not reach appellants' argument that they are entitled to punitive damages.

### III.

Earthtech, alone, argues that there is a genuine issue of material fact as to the existence of an oral forbearance agreement and its subsequent breach by MNB. Earthtech claims that Waller confirmed with Tyrrell, an MNB officer, that MNB would forbear from collection activities while she recovered from an emergency hysterectomy. Earthtech refers this Court to Waller's affidavits, deposition testimony of various actors in this case, and correspondence be-

tween the attorneys involved to support its argument that a forbearance agreement was reached.

Earthtech further argues that the circuit court also erred when it found that even if the oral forbearance agreement existed, it could not be enforced because it was impermissibly vague as to an essential term—the duration of the forbearance period. Earthtech goes on to contend that the intention of the parties was clear, stating: "[T]hey agreed to mutual forbearance for the period of Ms. Waller's recovery from surgery, a period which was anticipated to be from two to four weeks in duration."

Earthtech then presents this Court with five alleged breaches committed by MNB. They include: (1) on 9 May 1984, MNB seized Earthtech's corporate checking account resulting in a check for $721.94 not being honored by MNB; (2) MNB froze Earthtech's payroll; (3) MNB obtained a lien release on Waller's home from Equitable Bank; (4) on 9 May 1984, MNB demanded repayment of the Installment Note because Earthtech was in default under the Revolving Note; and (5) on 7 June 1984, pursuant to the parties' loan agreements, MNB entered confessed judgments against Earthtech and its officers.

The circuit court granted MNB's motion for summary judgment as to the forbearance agreement and gave several alternative reasons. First, the court stated that it had serious doubts as to the agreement's existence. Second, the court found that even if there was such an agreement, it could not be enforced because of the ambiguity in an essential term—the duration of the forbearance period. Finally, the court stated that even if the agreement existed, as a matter of law, MNB had not breached its terms. This position was also pressed by MNB during oral argument. We agree with the circuit court's final position and explain.

As in any case involving interpretation of a contract, we begin with the terms of the agreement. To determine the terms of the forbearance agreement we examine the portions of the record extract to which Earthtech refers us and

will accept as true any allegations made by Earthtech employees in their affidavits and depositions. We turn first to Waller's affidavits. In her 19 April 1991 affidavit, she states, at paragraph 5:

> During the first week of May 1984 I again spoke with Mr. Tyrrell [an MNB officer]. In that conversation I advised Mr. Tyrrell that I required an emergency hysterectomy. Upon learning of that, Mr. Tyrrell offered to enter into a forbearance agreement with Earthtech so that I could *recover from the surgery.* We agreed that for several weeks the Bank would not conduct any *collection efforts* on Earthtech's loan in return for Earthtech's promise not to seek injunctive relief from the Bank's collection efforts and to not move Earthtech's deposits from the Bank. (Emphasis supplied).

Waller submitted two more affidavits, both of which reiterate her basic understanding of the alleged forbearance agreement. In her 15 July 1991 affidavit, Waller stated, "I confirmed with Mr. Tyrrell that the bank still agreed to forebear during my recuperation from surgery. We agreed that for several weeks the Bank would not conduct any collection efforts...." Waller estimated her recuperation period would last approximately two to four weeks. Earthtech also highlights the deposition testimony of Jacquelyn Seely, Earthtech's business manager, in which she recounted her understanding of the alleged forbearance agreement. She stated:

> Before Muriel [Waller] went into the hospital in May, we were told that she would be given an opportunity to go into the hospital, have her surgery, convalesce, at which point we would begin negotiating a workout with the bank a formal workout, in fact, they would not do anything in terms of calling our loan for that period of time.

██ Accepting the truth of the above statements, the duration of the forbearance period was to be the amount of time it took Waller to recuperate from her surgery. On 5 June 1984, Waller resumed "active involvement" in Earth-

tech on a part-time basis and on 11 June 1984 resumed full-time involvement. As soon as Waller resumed her active involvement in Earthtech on 5 June 1984, the period of forbearance, under the terms of the agreement and as outlined by Earthtech in its brief, came to an end. Another key term of the forbearance agreement was that MNB would not engage in any "collection efforts." We now examine the five breaches alleged by Earthtech.

First, Earthtech alleges that on 9 May 1984, MNB seized Earthtech's corporate checking account, an act that resulted in MNB not honoring a check for $721.94, payable to Earthtech's health insurer. Seely, however, testified in her deposition that she contacted MNB after the check failed to clear. MNB told her that each transaction was being scrutinized, but that they would clear the check. The check subsequently cleared. In addition, Waller testified at her deposition that Earthtech's entitlement to health benefits was not interrupted or revoked in any way. The only possible conclusion to be drawn is that this did not amount to a breach of the alleged agreement to forbear from "collection efforts."

Second, Earthtech alleges that MNB froze its payroll. An examination of the record extract reveals that ADP, the company responsible for processing Earthtech's payroll, called Seely to inform her that MNB had told ADP not to process Earthtech's payroll. Seely, however, is unable to identify the person with whom she spoke. In any event, Seely promptly contacted Ms. Kirby, an MNB employee with whom Seely often dealt. Kirby stated that she did not understand what the problem was, but that she would do some checking and get back to Seely. Shortly thereafter, Kirby called Seely to tell her there had been a mistake, that the problem had been cleared up, and that Earthtech's payroll would be processed. The payroll was not late. Earthtech also claims that MNB did not debit its account until the end of the month. Again, we fail to see how this slight difficulty, quickly straightened out by MNB, could be

regarded as a collection effort in violation of the alleged forbearance agreement.

Third, Earthtech claims that MNB's actions in obtaining and holding onto the lien release to Waller's residence from Equitable Bank also violated the alleged forbearance agreement. Equitable Bank possessed an indemnity deed of trust on Waller's residence as security for money loaned. The loan was paid off and Equitable executed the release in question. For some reason, Equitable sent the executed release to MNB. The inference in the accompanying letter is that Equitable was relying on MNB to record the release. MNB failed to take such action. We do not see, however, how MNB's possession of the lien release could give MNB any leverage over Earthtech or be considered a collection activity.[3]

Fourth, by letters dated 9 May 1984, MNB informed Earthtech and its officers that Earthtech was in default of the Revolving Note and demanded repayment of the Installment Note. The letters merely informed the parties of the status of the two notes held by MNB. Demanding payment of the Installment Note from the debtor is not the equivalent of engaging in collection activities. Therefore, as a matter of law, this action by MNB failed to breach the alleged forbearance agreement as outlined by Earthtech and Waller.

Fifth, Earthtech alleges that MNB's 7 June 1984 filing of the confessed judgments, pursuant to the parties' loan agreements also violated the alleged forbearance agreement. This alleged breach, however, is outside the time frame set up by the parties. Waller returned to "active involvement" in Earthtech, although on a part-time basis,

---

3. At the most, possessing the release and failing to record it would make it more difficult for Waller to borrow additional funds against her residence or to sell the residence. The record extract, however, also indicates that this was not the case because Waller was able to sell her home even without MNB recording the lien release. Therefore, Earthtech has failed to show how this could be a violation of the alleged forbearance agreement.

on 5 June 1984. Therefore, the forbearance period had passed and MNB did not breach the alleged agreement by filing the confessed judgments.

In summary, even if this Court assumes, *arguendo,* the existence of the forbearance agreement and its clear terms as outlined by the evidence that Earthtech sets forth, Earthtech is unable, as a matter of law, to refer us to a single breach of that agreement. Therefore, the circuit court did not err in granting MNB's motion for summary judgment as to Earthtech's claim for breach of the forbearance agreement.

## IV.

Earthtech next argues that the circuit court erred in finding no genuine dispute of material fact as to a breach of the Workout Agreement between Earthtech and MNB. Under the terms of the Workout Agreement, MNB agreed to dismiss the confessed judgment actions against Earthtech and its officers. Waller signed the Workout Agreement on or about 1 August 1984.[4] MNB did not dismiss the confessed judgment actions until 13 September 1984.

The paragraph of the Workout Agreement on which Earthtech relies states:

Upon execution of this agreement, the Bank agrees to dismiss without prejudice its suits as against EARTHTECH, and its individual guarantors [Earthtech's officers].

When a contract is silent as to the express time for performance, a reasonable time may be implied. *Anne Arundel County v. Crofton Corp.,* 286 Md. 666, 673, 410 A.2d 228 (1980); *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 617, 112 A.2d 901 (1955); *Coates v. Sangston,* 5 Md. 121, 130 (1853).

---

4. MNB never signed the Workout Agreement, but the parties acted as if the agreement was in effect. In addition, MNB does not dispute the existence of this agreement. We, therefore, proceed under the assumption that the agreement existed.

■ In the case *sub judice*, Earthtech never complained about the six weeks it took MNB to dismiss the confessed judgments. Earthtech continued to operate under the terms of the Workout Agreement, in fact, Earthtech repaid MNB ahead of the schedule set by the agreement. Reviewing the record extract and all factors applicable to the six week time frame that it took MNB to file the dismissals, we believe the circuit court was correct in holding, as a matter of law, that the delay did not constitute a breach of the Workout Agreement.

Earthtech also claims that the circuit court erred in granting MNB's motion for summary judgment based on Earthtech's failure to prove that it had suffered any damages from MNB's alleged breach of the Workout Agreement. Earthtech argues that the circuit court erred because MNB did not seek summary judgment on such grounds and Earthtech offered evidence that demonstrated that it was damaged by MNB's breach. Because we hold that MNB, as a matter of law, did not breach the Workout Agreement, we need not reach this question.

## V.

Waller, alone, argues that the circuit court erred in dismissing Count VI of the complaint, intentional infliction of emotional distress, for failure to state a claim upon which relief can be granted pursuant to Md.Rule 2–322(b). Waller refers this Court to the amended complaint and highlights, in the appellants' brief, several allegations that she believes shows that she properly pled a claim for intentional infliction of emotional distress.

■ In reviewing the grant or denial of a motion to dismiss, this Court must consider whether, "when all well-pleaded material facts in the complaint and any exhibits thereto, as well as any reasonable inferences that may be drawn therefrom are taken as true, a set of facts is alleged, which, if proven, would entitle the [appellant] to relief." *MacGill v. Blue Cross of Md., Inc.*, 77 Md.App. 613, 621,

551 A.2d 501, *cert. denied,* 315 Md. 692, 556 A.2d 673 (1989). In addition, we must view the well-pleaded allegations in a light most favorable to appellant. *Berman v. Karvounis,* 308 Md. 259, 264, 518 A.2d 726 (1987). We will consider, however, only "allegations of fact and inferences deducible from them, not merely conclusory charges." *Id.* at 265, 518 A.2d 726.

The Court of Appeals first recognized the tort of intentional infliction of emotional distress in *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977), and set forth the four elements that must be present in order to impose liability:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Id.* at 566, 380 A.2d 611. In *Kentucky Fried Chicken Nat'l Management Co. v. Weathersby,* 326 Md. 663, 607 A.2d 8 (1992), the Court of Appeals reiterated its belief that this tort should be "used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Id.* at 670, 607 A.2d 8.

In MNB's motion to dismiss, it focused on the absence of the second element—extreme and outrageous conduct—claiming that Waller failed to adequately plead this element. We, therefore, concentrate our discussion of this issue on the second element of the tort.

Waller alleged the following conduct by MNB in her amended complaint: (1) MNB's interference with the processing of Earthtech's payroll; (2) MNB's demand for an IDOT on Waller's residence; (3) Tyrrell's statement to Waller that he could call the Revolving Note if he did not like "the color of your shirt"; (4) a statement by an MNB vice-president that Tyrrell's actions were regrettable, but that MNB supported his actions; (5) MNB's seizure of Earthtech's accounts while Waller was hospitalized and in violation of a forbearance agreement; (6) MNB's causing

delivery of confessed judgments upon Waller at her home at 6:30 a.m. on a Sunday morning by an armed sheriff; (7) MNB's interference with Earthtech's receipt of proceeds from an auction of Earthtech's equipment; (8) MNB's obtaining the lien release on Waller's home from Equitable Bank; (9) MNB's delay in providing documentation that Earthtech had paid off its debts to MNB; (10) MNB's reports to commercial credit bureaus despite its promise not to do so and at a time when no judgments were outstanding; and (11) MNB's failure to remove such information after the debt was repaid.

■■■ The Court of Appeals, in *Harris* and *Batson v. Shiflett*, 325 Md. 684, 602 A.2d 1191 (1992), quote at length from the Restatement (Second) of Torts § 46 (1965) to explain what type of conduct must be present such that it rises to the level of the extreme and outrageous. We follow suit:

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

* * * * * *

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and occasional acts that are definitely inconsiderate and unkind....

*Id.* cmt. d; *Harris*, 281 Md. at 567, 380 A.2d 611; *Batson*, 325 Md. at 736, 602 A.2d 1191. Conduct rises to this level only if "the average member of the community ... regard[s] the defendant's conduct ... as being a complete denial of the plaintiff's dignity as a person." *Dick v. Mercantile–Safe Deposit & Trust Co.*, 63 Md.App. 270, 276,

492 A.2d 674 (1985) (quoting *Alsteen v. Gehl,* 21 Wis.2d 349, 124 N.W.2d 312, 318 (1963)).

 When deciding whether an actor's conduct rises to the level of the extreme and outrageous, we will not consider it in a vacuum. The context in which the conduct took place is vital to determining its nature. *Batson,* 325 Md. at 736, 602 A.2d 1191. In addition, a defendant's knowledge of the plaintiff's particular sensitivity must also be considered in evaluating the defendant's conduct. *Kentucky Fried Chicken,* 326 Md. at 671–75, 607 A.2d 8. The Restatement (Second) of Torts discusses the impact of an actor's knowledge of an individual's particular sensitivity upon the evaluation of the actor's conduct:

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

Restatement (Second) of Torts § 46 cmt. f.

 Considering all the evidence in the light most favorable to Waller, we conclude that the circuit court was correct in dismissing Count VI for failure to state a claim because the second element of the tort was not met. We do not deny that MNB's conduct, as alleged, was rude, insensitive, and callous. It was not, however, extreme and outrageous. We believe this is so even in light of Waller's illness and MNB's knowledge of that illness. Waller, as president of Earthtech, and MNB had a business relationship and it is in that context that we must view MNB's actions. Further, MNB was Earthtech's creditor and as such had the right to insist upon payment of the debts owed by Earthtech. MNB could "threaten to resort to proper legal procedures to

enforce the obligation, even if the steps taken cause some degree of mental anguish and anxiety." *Dick*, 63 Md.App. at 276, 492 A.2d 674, quoting Annot., 87 A.L.R.3d 201, 205 (1978). MNB's persistent attempts to seek extra collateral, to put pressure on Earthtech and Waller to repay the loans, and to pursue actively every means of protecting itself against loss were, we are sure, very stressful to Waller. Yet, we are not convinced that MNB's conduct rose to the stringent standard of the extreme and outrageous. The circuit court, therefore, properly dismissed Waller's claim for intentional infliction of emotional distress.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.